REEVES, INC. *v.* STAKE ET AL.

No. 79-677. Argued April 16, 1980—Decided June 19, 1980

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, and REHNQUIST, JJ., joined. POWELL, J., filed a dissenting opinion, in which BRENNAN, WHITE, and STEVENS, JJ., joined, *post*, p. 447.

*Dennis M. Kirven* argued the cause and filed a brief for petitioner.

*William J. Janklow* argued the cause for respondents. On the brief were *Michael B. DeMersseman* and *Curtis S. Jensen.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The issue in this case is whether, consistent with the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, the State of South Dakota, in a time of shortage, may confine the sale of the cement it produces solely to its residents.

I

In 1919, South Dakota undertook plans to build a cement plant. The project, a product of the State's then prevailing Progressive political movement, was initiated in response to recent regional cement shortages that "interfered with and delayed both public and private enterprises," and that were "threatening the people of this state." *Eakin* v. *South Dakota State Cement Comm'n,* 44 S. D. 268, 272, 183 N. W. 651, 652

(1921).[1]  In 1920, the South Dakota Cement Commission anticipated "[t]hat there would be a ready market for the entire output of the plant within the state."  Report of State

---

[1] It was said that the plant was built because the only cement plant in the State "had been operating successfully for a number of years until it had been bought by the so-called trust and closed down."  Report of South Dakota State Cement Commission 6 (1920).  In its report advocating creation of a cement plant, the Commission noted both the substantial profits being made by private producers in the prevailing market, and the fact that producers outside the State were "now supplying all the cement used in" South Dakota.  Under the circumstances, the Commission reasoned, it would not be to the "capitalists['] . . . advantage to build a new plant within the state."  Id., at 8.  This skepticism regarding private industry's ability to serve public needs was a hallmark of Progressivism. See, e. g., R. Hofstadter, The Age of Reform 227 (1955) ("In the Progressive era the entire structure of business . . . became the object of a widespread hostility").  South Dakota, earlier a bastion of Populism, id., at 50, became a leading Progressivist State.  See R. Nye, Midwestern Progressive Politics 217–218 (1959); G. Mowry, Theodore Roosevelt and the Progressive Movement 155, and n. 125 (1946).  Roosevelt carried South Dakota in the election of 1912, id., at 281, n. 69, and Robert La Follette—on a platform calling for public ownership of railroads and waterpower, see K. MacKay, The Progressive Movement of 1924, pp. 270–271 (app. 4) (1966)—ran strongly (36.9%) in the State in 1924. Congressional Quarterly's Guide to U. S. Elections 287 (1975).

The backdrop against which the South Dakota cement project was initiated is described in H. Schell, History of South Dakota 268–269 (3d ed. 1975):

"Although a majority of the voters [in 1918] had seemingly subscribed to a state-ownership philosophy, it was a question how far the Republican administration at Pierre would go in fulfilling campaign promises.  As [Governor] Norbeck entered upon his second term, he again urged a state hail insurance law and advocated steps toward a state-owned coal mine, cement plant, and state-owned stockyards.  He also recommended an appropriation for surveying dam sites for hydroelectric development.  The lawmakers readily enacted these recommendations into law, except for the stockyards proposal. . . .

". . . In retrospect, [Norbeck's] program must be viewed as a part of the Progressives' campaign against monopolistic prices.  There was, moreover, the fervent desire to make the services of the state government

Cement Commission 9 (1920). The plant, however, located at Rapid City, soon produced more cement than South Dakotans could use. Over the years, buyers in no less than nine nearby States purchased cement from the State's plant. App. 26. Between 1970 and 1977, some 40% of the plant's output went outside the State.

The plant's list of out-of-state cement buyers included petitioner Reeves, Inc. Reeves is a ready-mix concrete [2] distributor organized under Wyoming law and with facilities in Buffalo, Gillette, and Sheridan, Wyo. *Id.*, at 15. From the beginning of its operations in 1958, and until 1978, Reeves purchased about 95% of its cement from the South Dakota plant. *Id.*, at 15 and 22. In 1977, its purchases were $1,172,000. *Id.*, at 17. In turn, Reeves has supplied three northwestern Wyoming counties with more than half their ready-mix concrete needs. *Id.*, at 15. For 20 years the relationship between Reeves and the South Dakota cement plant was amicable, uninterrupted, and mutually profitable.

As the 1978 construction season approached, difficulties at the plant slowed production. Meanwhile, a booming construction industry spurred demand for cement both regionally and nationally. *Id.*, at 13. The plant found itself unable to meet all orders. Faced with the same type of "serious cement shortage" that inspired the plant's construction, the Commission "reaffirmed its policy of supplying all South Dakota customers first and to honor all contract commit-

available to agriculture. . . . These were basic tenets of the Progressive philosophy of government."

[2] "[C]ement is a finely ground manufactured mineral product, usually gray in color. It is mixed with water and sand, gravel, crushed stone, or other aggregates to form concrete, the rock-like substance that is the most widely used construction material in the world." Portland Cement Association, The U. S. Cement Industry, An Economic Report 5 (2d ed. 1978). "Ready-mixed concrete is the term applied to ordinary concrete that is mixed at a central depot instead of on the construction site, and is distributed in special trucks." 4 Encyclopedia Britannica 1077 (1974).

ments, with the remaining volume allocated on a first come, first served basis." *Ibid.*[3]

Reeves, which had no pre-existing long-term supply contract, was hit hard and quickly by this development. On June 30, 1978, the plant informed Reeves that it could not continue to fill Reeves' orders, and on July 5, it turned away a Reeves truck. *Id.,* at 17–18. Unable to find another supplier, *id.,* at 21, Reeves was forced to cut production by 76% in mid-July. *Id.,* at 20.

On July 19, Reeves brought this suit against the Commission, challenging the plant's policy of preferring South Dakota buyers, and seeking injunctive relief. *Id.,* at 3–10. After conducting a hearing and receiving briefs and affidavits, the District Court found no substantial issue of material fact and permanently enjoined the Commission's practice. The court reasoned that South Dakota's "hoarding" was inimical to the national free market envisioned by the Commerce Clause. *Id.,* at 27–30.

The United States Court of Appeals for the Eighth Circuit reversed. *Reeves, Inc.* v. *Kelley,* 586 F. 2d 1230, 1232 (1978). It concluded that the State had "simply acted in a proprietary capacity," as permitted by *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794 (1976). Petitioner sought certiorari. This Court granted the petition, vacated the judgment, and remanded the case for further consideration in light of *Hughes* v. *Oklahoma,* 441 U. S. 322 (1979). *Reeves, Inc.* v. *Kelley,* 441 U. S. 939 (1979). On remand, the Court of Appeals distinguished that case.[4] Again relying on *Alexandria*

---

[3] It is not clear when the State initiated its policy preferring South Dakota customers. The record, however, shows that the policy was in place at least by 1974. App. 24.

[4] We now agree with the Court of Appeals that *Hughes* v. *Oklahoma* does not bear on analysis here. That case involved a State's attempt " 'to prevent privately owned articles of trade from being shipped and sold in interstate commerce.' " *Philadelphia* v. *New Jersey,* 437 U. S. 617, 627 (1978), quoting *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, 10

*Scrap,* the court abided by its previous holding. *Reeves, Inc.* v. *Kelley,* 603 F. 2d 736 (1979). We granted Reeves' petition for certiorari to consider once again the impact of the Commerce Clause on state proprietary activity. 444 U. S. 1031 (1980).[5]

## II

### A

*Alexandria Scrap* concerned a Maryland program designed to remove abandoned automobiles from the State's roadways and junkyards. To encourage recycling, a "bounty" was offered for every Maryland-titled junk car converted into scrap. Processors located both in and outside Maryland were eligible to collect these subsidies. The legislation, as initially enacted in 1969, required a processor seeking a bounty to present documentation evidencing ownership of the wrecked car. This requirement however, did not apply to "hulks," inoperable automobiles over eight years old. In 1974, the statute was amended to extend documentation requirements to hulks, which comprised a large majority of the junk cars being processed. Departing from prior practice, the new law imposed more exacting documentation requirements on out-of-state than in-state processors. By making it less remunerative for suppliers to transfer vehicles outside Maryland, the

(1928). Thus, it involved precisely the type of activity distinguished by the Court in *Alexandria Scrap.* See 426 U. S., at 805–806.

[5] During the pendency of this litigation, economic conditions have permitted South Dakota to discontinue enforcement of its resident-preference policy. We agree with the parties, however, that the case has not become moot. During at least three construction seasons within as many decades the cement plant has been unable, or nearly unable, to satisfy demand. See, *e. g.,* Twelfth Biennial Report of the South Dakota State Cement Commission (1948); App. 23 (affidavit of C. A. Reeves). Under these circumstances, "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein* v. *Bradford,* 423 U. S. 147, 149 (1975).

reform triggered a "precipitate decline in the number of bounty-eligible hulks supplied to appellee's [Virginia] plant from Maryland sources." 426 U. S., at 801. Indeed, "[t]he practical effect was substantially the same as if Maryland had withdrawn altogether the availability of bounties on hulks delivered by unlicensed suppliers to licensed non-Maryland processors." *Id.*, at 803, n. 13; see *id.*, at 819 (dissenting opinion).

Invoking the Commerce Clause, a three-judge District Court struck down the legislation. 391 F. Supp. 46 (Md. 1975). It observed that the amendment imposed "substantial burdens upon the free flow of interstate commerce," *id.*, at 62, and reasoned that the discriminatory program was not the least disruptive means of achieving the State's articulated objective. *Id.*, at 63. See generally *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970).[6]

This Court reversed. It recognized the persuasiveness of the lower court's analysis if the inherent restrictions of the Commerce Clause were deemed applicable. In the Court's view, however, *Alexandria Scrap* did not involve "the kind of action with which the Commerce Clause is concerned." 426 U. S., at 805. Unlike prior cases voiding state laws inhibiting interstate trade, "Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price," *id.*, at 806, "as a purchaser, in effect, of a potential article of interstate commerce," and has restricted "its trade to its own citizens or businesses within the State." *Id.*, at 808.[7]

---

[6] Maryland sought to justify its reform as an effort to reduce bounties paid to out-of-state processors on Maryland-titled cars abandoned outside Maryland. The District Court concluded that Maryland could achieve this goal more satisfactorily by simply restricting the payment of bounties to only those cars abandoned in Maryland.

[7] The Court invoked this rationale after explicitly reiterating the District Court's finding that the Maryland program imposed " 'substantial

Having characterized Maryland as a market participant, rather than as a market regulator, the Court found no reason to "believe the Commerce Clause was intended to require independent justification for [the State's] action." *Id.*, at 809. The Court couched its holding in unmistakably broad terms. "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Id.*, at 810 (footnote omitted).[8]

## B

The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law. As that case explains, the

---

burdens upon the free flow of interstate commerce.'" 426 U. S., at 804. Moreover, the Court was willing to accept the Virginia processor's characterization of the Maryland program as "reducing in some manner the flow of goods in interstate commerce." *Id.*, at 805. Given this concession, we are unable to accept the dissent's description of *Alexandria Scrap* as a case in which "we found no burden on commerce," *post,* at 451, "concluded that the subsidies . . . erected no barriers to trade," *post,* at 452, and determined that the Maryland program did not "cut off," *ibid.*, or "impede the flow of interstate commerce," *post,* at 450. Indeed, even the dissent in the present case recognizes that the Maryland subsidy program "divert[ed] Maryland 'hulks' to in-state processors." *Post,* at 451. To be sure, *Alexandria Scrap* rejected the argument that "the bounty program constituted an *impermissible* burden on interstate commerce." *Ibid.* (emphasis added). It did so, however, solely because Maryland had "entered into the market itself." 426 U. S., at 806. Thus, the two-step analysis distilled by the dissent from *Alexandria Scrap,* see *post,* at 451–453, collapses into a single inquiry: whether the challenged "program constituted direct state participation in the market." *Post,* at 451. The dissent agrees that that question is to be answered in the affirmative here. *Ibid.*

[8] The dissent's central criticisms of the result reached here seem to be that the South Dakota policy does not emanate from "the power of governments to supply their own needs," and that it threatens " 'the natural functioning of the interstate market.'" *Post,* at 450. The same observations, however, apply with equal force to the subsidy program challenged in *Alexandria Scrap.*

Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace. *Id.*, at 807–808, citing *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525, 539 (1949) (referring to "home embargoes," "customs duties," and "regulations" excluding imports). There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market. See L. Tribe, American Constitutional Law 336 (1978) ("the commerce clause was directed, as an historical matter, only at regulatory and taxing actions taken by states in their sovereign capacity"). The precedents comport with this distinction.[9]

---

[9] *Alexandria Scrap* does not stand alone. In *American Yearbook Co.* v. *Askew,* 339 F. Supp. 719 (MD Fla. 1972), a three-judge District Court upheld a Florida statute requiring the State to obtain needed printing services from in-state shops. It reasoned that "state proprietary functions" are exempt from Commerce Clause scrutiny. *Id.,* at 725. This Court affirmed summarily. 409 U. S. 904 (1972). Numerous courts have rebuffed Commerce Clause challenges directed at similar preferences that exist in "a substantial majority of the states." Note, 58 Iowa L. Rev. 576 (1973). *City of Phoenix* v. *Superior Court,* 109 Ariz. 533, 535, 514 P. 2d 454, 456 (1973) (citing *American Yearbook* to reaffirm *Schrey* v. *Allison Steel Mfg. Co.,* 75 Ariz. 282, 255 P. 2d 604 (1953)); *Denver* v. *Bossie,* 83 Colo. 329, 266 P. 214 (1928); *In re Gemmill,* 20 Idaho 732, 119 P. 298 (1911); *People ex rel. Holland* v. *Bleigh Constr. Co.,* 61 Ill. 2d 258, 274–275, 335 N. E. 2d 469, 479 (1975) (citing *American Yearbook*); *State ex rel. Collins* v. *Senatobia Blank Book & Stationery Co.,* 115 Miss. 254, 76 So. 258 (1917); *Allen* v. *Labsap,* 188 Mo. 692, 87 S. W. 926 (1905); *Hersey* v. *Neilson,* 47 Mont. 132, 131 P. 30 (1913); *Tribune Printing & Binding Co.* v. *Barnes,* 7 N. D. 591, 75 N. W. 904 (1898). See also *Dixon-Paul Printing Co.* v. *Board of Public Contracts,* 117 Miss. 83, 77 So. 908 (1918); *Luboil Heat & Power Corp.* v. *Pleydell,* 178 Misc. 562, 564, 34 N. Y. S. 2d 587, 591 (Sup. 1942). The only clear departure from this pattern, *People ex rel. Treat* v. *Coler,* 166 N. Y. 144, 59 N. E. 776 (1901), drew a strong dissent, and has been uniformly criticized in later decisions. See, *e. g., State ex rel. Collins* v. *Senatobia Blank Book & Stationery Co., supra; Allen* v. *Labsap, supra.*

One other case merits comment. In *Bethlehem Steel Corp.* v. *Board of Commissioners,* 276 Cal. App. 2d 221, 80 Cal. Rptr. 800 (1969), the court

Restraint in this area is also counseled by considerations of state sovereignty,[10] the role of each State " 'as guardian and trustee for its people,' " *Heim* v. *McCall*, 239 U. S. 175, 191 (1915), quoting *Atkin* v. *Kansas*, 191 U. S. 207, 222–223 (1903),[11] and "the long recognized right of trader or manu-

struck down a California statute requiring the State to contract only with persons who promised to use or supply materials produced in the United States. In Opinion No. 69–253, 53 Op. Cal. Atty. Gen. 72 (1970), the State's Attorney General reasoned that *Bethlehem Steel* similarly prohibited, under the "foreign commerce" Clause, statutes giving a preference to California-produced goods. We have no occasion to explore the limits imposed on state proprietary actions by the "foreign commerce" Clause or the constitutionality of "Buy American" legislation. Compare *Bethlehem Steel Corp.*, supra, with *K. S. B. Technical Sales Corp.* v. *North Jersey Dist. Water Supply Comm'n*, 75 N. J. 272, 381 A. 2d 774 (1977). We note, however, that Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged. See *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434 (1979).

[10] See *American Yearbook Co.* v. *Askew*, 339 F. Supp., at 725 ("ad hoc" inquiry into burdening of interstate commerce "would unduly interfere with state proprietary functions if not bring them to a standstill"). Considerations of sovereignty independently dictate that marketplace actions involving "integral operations in areas of traditional governmental functions"—such as the employment of certain state workers—may not be subject even to congressional regulation pursuant to the commerce power. *National League of Cities* v. *Usery*, 426 U. S. 833, 852 (1976). It follows easily that the intrinsic limits of the Commerce Clause do not prohibit state marketplace conduct that falls within this sphere. Even where "integral operations" are not implicated, States may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal. The Supreme Court, 1975 Term, 90 Harv. L. Rev. 1, 56, 63 (1976).

[11] See *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S., at 13 ("As the representative of its people, the State might have retained the shrimp for consumption and use therein"); *Toomer* v. *Witsell*, 334 U. S. 385, 409 (1948) (concurring opinion) (state power to provide for own citizens by developing food supply distinguished from interference with private transactions in food products); *Helvering* v. *Gerhardt*, 304 U. S. 405, 427 (1938) (concurring opinion) ("The genius of our government provides that, within the sphere of constitutional action, the people . . .

facturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919).[12] Moreover, state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants.[13] Evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause. See *State ex rel. Collins* v. *Senatobia Blank Book & Stationery Co.*, 115 Miss. 254, 260, 76 So. 258, 260 (1917); *Tribune Printing & Binding Co.* v. *Barnes*, 7 N. D. 591, 597, 75 N. W. 904, 906 (1898). Finally, as this case illustrates, the competing considerations in cases involving state proprietary action often will be subtle, complex, politically charged, and difficult to assess under traditional Commerce Clause analysis. Given these factors, *Alexandria Scrap* wisely recognizes that, as a rule, the adjustment of interests in this context is a task better suited for Congress than this Court.

---

have the power to determine as conditions demand, what services and functions the public welfare requires").

[12] When a State buys or sells, it has the attributes of both a political entity and a private business. Nonetheless, the dissent would dismiss altogether the "private business" element of such activity and focus solely on the State's political character. *Post*, at 450. The Court, however, heretofore has recognized that "[*l*]*ike private individuals and businesses,* the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 127 (1940) (emphasis added). While acknowledging that there may be limits on this sweepingly phrased principle, we cannot ignore the similarities of private businesses and public entities when they function in the marketplace.

[13] See, *e. g., National League of Cities* v. *Usery,* 426 U. S., at 854, n. 18; *New York* v. *United States,* 326 U. S. 572 (1946); *United States* v. *California,* 297 U. S. 175 (1936). See also *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389 (1978).

## III

South Dakota, as a seller of cement, unquestionably fits the "market participant" label more comfortably than a State acting to subsidize local scrap processors. Thus, the general rule of *Alexandria Scrap* plainly applies here.[14] Petitioner argues, however, that the exemption for marketplace participation necessarily admits of exceptions. While conceding that possibility, we perceive in this case no sufficient reason to depart from the general rule.

## A

In finding a Commerce Clause violation, the District Court emphasized "that the Commission . . . made an election to become part of the interstate commerce system." App. 28. The gist of this reasoning, repeated by petitioner here, is that one good turn deserves another. Having long exploited the interstate market, South Dakota should not be permitted to withdraw from it when a shortage arises. This argument is not persuasive. It is somewhat self-serving to say that South Dakota has "exploited" the interstate market. An equally fair characterization is that neighboring States long have benefited from South Dakota's foresight and industry. Viewed in this light, it is not surprising that *Alexandria Scrap* rejected an argument that the 1974 Maryland legislation challenged there was invalid because cars abandoned in Maryland had been processed in neighboring States for five years. As in *Alexandria Scrap,* we must conclude that "this chronology does not distinguish the case, for Commerce Clause purposes,

---

[14] The criticism received by *Alexandria Scrap* in part has been directed at its application of the proprietary immunity to state subsidy programs. See Note, 18 B. C. Ind. & Com. L. Rev. 893, 924–925 (1977). But see The Supreme Court, 1975 Term, 90 Harv. L. Rev., at 60–61. We have no occasion here to inquire whether subsidy programs unlike that involved in *Alexandria Scrap* warrant characterization as proprietary, rather than regulatory, activity. Cf. 18 B. C. Ind. & Com. L. Rev., at 913–915.

from one in which a State offered [cement] only to domestic [buyers] from the start." 426 U. S., at 809.[15]

Our rejection of petitioner's market-exploitation theory fundamentally refocuses analysis. It means that to reverse we would have to void a South Dakota "residents only" policy even if it had been enforced from the plant's very first days. Such a holding, however, would interfere significantly with a State's ability to structure relations exclusively with its own citizens. It would also threaten the future fashioning of effective and creative programs for solving local problems and distributing government largesse. See n. 1, *supra*. A healthy regard for federalism and good government renders us reluctant to risk these results.

> "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting).

---

[15] *Alexandria Scrap* explained:

"It is true that the state money initially was made available to licensed out-of-state processors as well as those located within Maryland, and not until the 1974 amendment was the financial benefit channeled, in practical effect, to domestic processors. But this chronology does not distinguish the case, for Commerce Clause purposes, from one in which a State offered bounties only to domestic processors from the start. Regardless of when the State's largesse is first confined to domestic processors, the effect upon the flow of hulks resting within the State is the same: they will tend to be processed inside the State rather than flowing to foreign processors. But no trade barrier of the type forbidden by the Commerce Clause, and involved in previous cases, impedes their movement out of State. They remain within Maryland in response to market forces, including that exerted by money from the State." 426 U. S., at 809–810. (Footnote omitted.)

## B

Undaunted by these considerations, petitioner advances four more arguments for reversal:

First, petitioner protests that South Dakota's preference for its residents responds solely to the "non-governmental objectiv[e]" of protectionism. Brief for Petitioner 25. Therefore, petitioner argues, the policy is *per se* invalid. See *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978).

We find the label "protectionism" of little help in this context. The State's refusal to sell to buyers other than South Dakotans is "protectionist" only in the sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve. Petitioner's argument apparently also would characterize as "protectionist" rules restricting to state residents the enjoyment of state educational institutions, energy generated by a state-run plant, police and fire protection, and agricultural improvement and business development programs. Such policies, while perhaps "protectionist" in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State.[16]

---

[16] Petitioner would distinguish *Alexandria Scrap* as involving state legislation designed to advance the nonprotectionist goal of environmentalism. This characterization is an oversimplification. The challenged feature of the Maryland program—the discriminatory documentation requirement—was not aimed at improving the environment; indeed by decreasing the profit margin a hulk supplier could expect to receive if he delivered to the most accessible recycling plant, it is likely that the amendment somewhat set back the goal of encouraging hulk processing. The stated justification for the discriminatory regulation—reducing payments to out-of-state processors for recycling of hulks abandoned outside Maryland—was not even mentioned by the Court in rebuffing the Virginia processor's Commerce Clause challenge. Indeed, the central point of the Court's analysis was that demonstration of an "independent justification" was unnecessary to sustain the State's program. See Note, 18 B. C. Ind. &

Second, petitioner echoes the District Court's warning:

"If a state in this union, were allowed to hoard its commodities or resources for the use of their own residents only, a drastic situation might evolve. For example, Pennsylvania or Wyoming might keep their coal, the northwest its timber, and the mining states their minerals. The result being that embargo may be retaliated by embargo and commerce would be halted at state lines." App. 29.

See, e. g., Baldwin v. Montana Fish & Game Comm'n, 436 U. S. 371, 385–386 (1978). This argument, although rooted in the core purpose of the Commerce Clause, does not fit the present facts. Cement is not a natural resource, like coal, timber, wild game, or minerals. Cf. Hughes v. Oklahoma, 441 U. S. 322 (1979) (minnows); Philadelphia v. New Jersey, supra (landfill sites); Pennsylvania v. West Virginia, 262 U. S. 553 (1923) (natural gas); West v. Kansas Natural Gas

Com. L. Rev., at 927–928. At bottom, the discrimination challenged in Alexandria Scrap was motivated by the same concern underlying South Dakota's resident-preference policy—a desire to channel state benefits to the residents of the State supplying them. If some underlying "commendable as well as legitimate" purpose, 426 U. S., at 809, is also required, it is certainly present here. In establishing the plant, South Dakota sought the most unstartling governmental goal: improvement of the quality of life in that State by generating a supply of a previously scarce product needed for local construction and governmental improvements. A cement program, to be sure, may be a somewhat unusual or unorthodox way in which to utilize state funds to improve the quality of residents' lives. But "[a] State's project is as much a legitimate governmental activity whether it is traditional, or akin to private enterprise, or conducted for profit. . . . A State may deem it as essential to its economy that it own and operate a railroad, a mill, or an irrigation system as it does to own and operate bridges, street lights, or a sewage disposal plant. What might have been viewed in an earlier day as an improvident or even dangerous extension of state activities may today be deemed indispensable." New York v. United States, 326 U. S., at 591 (dissenting opinion).

*Co.,* 221 U. S. 229 (1911) (same); Note, 32 Rutgers L. Rev. 741 (1979). It is the end product of a complex process whereby a costly physical plant and human labor act on raw materials. South Dakota has not sought to limit access to the State's limestone or other materials used to make cement. Nor has it restricted the ability of private firms or sister States to set up plants within its borders. Tr. of Oral Arg. 4. Moreover, petitioner has not suggested that South Dakota possesses unique access to the materials needed to produce cement.[17] Whatever limits might exist on a State's ability to invoke the *Alexandria Scrap* exemption to hoard resources which by happenstance are found there, those limits do not apply here.

Third, it is suggested that the South Dakota program is infirm because it places South Dakota suppliers of ready-mix concrete at a competitive advantage in the out-of-state market; Wyoming suppliers, such as petitioner, have little chance against South Dakota suppliers who can purchase cement from the State's plant and freely sell beyond South Dakota's borders.

The force of this argument is seriously diminished, if not eliminated, by several considerations. The argument neces-

---

[17] Nor has South Dakota cut off access to its own cement altogether, for the policy does not bar resale of South Dakota cement to out-of-state purchasers. Although the out-of-state buyer in the secondary market will undoubtedly have to pay a markup not borne by South Dakota competitors, this result is not wholly unjust. There should be little question that South Dakota at least could exact a premium on out-of-state purchases to compensate it for the State's investment and risk in the plan. If one views the added markup paid by out-of-state buyers to South Dakota middlemen as the rough equivalent of this "premium," the challenged program equates with a permissible result. The "bottom line" of the scheme closely parallels the result in *Alexandria Scrap:* out-of-state concrete suppliers are not removed from the market altogether; to compete successfully with in-state competitors, however, they must achieve additional efficiencies or exploit natural advantages such as their location to offset the incremental advantage channeled by the State's own market behavior to in-state concrete suppliers.

sarily implies that the South Dakota scheme would be unobjectionable if sales in other States were totally barred. It therefore proves too much, for it would tolerate even a greater measure of protectionism and stifling of interstate commerce than the challenged system allows. See *K. S. B. Technical Sales Corp.* v. *North Jersey Dist. Water Supply Comm'n*, 75 N. J. 272, 298, 381 A. 2d 774, 787 (1977) ("It would be odd indeed to find that when a state becomes less parochial . . . its purpose becomes suspect under the Commerce Clause"). Cf. *Pike* v. *Bruce Church, Inc.*, 397 U. S., at 142 ("And the extent of the burden that will be tolerated will of course depend . . . on whether [the state interest] could be promoted as well with a lesser impact on interstate activities"). Nor is it to be forgotten that *Alexandria Scrap* approved a state program that "not only . . . effectively protect[ed] scrap processors with existing plants in Maryland from the pressures of competitors with nearby out-of-state plants, but [that] implicitly offer[ed] to extend similar protection to any competitor . . . willing to erect a scrap processing facility within Maryland's boundaries." 391 F. Supp., at 63. Finally, the competitive plight of out-of-state ready-mix suppliers cannot be laid solely at the feet of South Dakota. It is attributable as well to their own States' not providing or attracting alternative sources of supply and to the suppliers' own failure to guard against shortages by executing long-term supply contracts with the South Dakota plant.

In its last argument, petitioner urges that, had South Dakota not acted, free market forces would have generated an appropriate level of supply at free market prices for all buyers in the region. Having replaced free market forces, South Dakota should be forced to replicate how the free market would have operated under prevailing conditions.

This argument appears to us to be simplistic and speculative. The very reason South Dakota built its plant was because the free market had failed adequately to supply the

region with cement. See n. 1, *supra*. There is no indication, and no way to know, that private industry would have moved into petitioner's market area, and would have ensured a supply of cement to petitioner either prior to or during the 1978 construction season. Indeed, it is quite possible that petitioner would never have existed—far less operated successfully for 20 years—had it not been for South Dakota cement.[18]

## C

We conclude, then, that the arguments for invalidating South Dakota's resident-preference program are weak at best. Whatever residual force inheres in them is more than offset by countervailing considerations of policy and fairness. Reversal would discourage similar state projects, even though this project demonstrably has served the needs of state residents and has helped the entire region for more than a half century. Reversal also would rob South Dakota of the intended benefit of its foresight, risk, and industry.[19] Under

---

[18] Petitioner also seeks to distinguish *Alexandria Scrap* on the ground that there, unlike here, the State "created" the relevant market. See 426 U. S., at 814–817 (concurring opinion). It is clear, however, that *Alexandria Scrap* could not, and did not, rest on the notion that Maryland had created the interstate market in hulks. *Id.*, at 809, n. 18. See *id.*, at 824–826, n. 6 (dissenting opinion); Note, 18 B. C. Ind. & Com. L. Rev., at 927; The Supreme Court, 1975 Term, 90 Harv. L. Rev., at 62, n. 27; Note, 34 Wash. & Lee L. Rev. 979, 995 (1977).

[19] The risk borne by South Dakota in establishing the cement plant is not to be underestimated. As explained in n. 1, *supra,* the cement plant was one of several projects through which the Progressive state government sought to deal with local problems. The fate of other similar projects illustrates the risk borne by South Dakota taxpayers in setting up the cement plant at a cost of some $2 million. Thus, "[t]he coal mine was sold in early 1934 for $5,500 with an estimated loss of nearly $175,000 for its fourteen years of operation. The 1933 Legislature also liquidated the state bonding department and the state hail insurance project. The total loss to the taxpayers from the latter venture was approximately $265,000." H. Schell, History of South Dakota 286 (3d ed. 1975).

these circumstances, there is no reason to depart from the general rule of *Alexandria Scrap*.

The judgment of the United States Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE STEVENS join, dissenting.

The South Dakota Cement Commission has ordered that in times of shortage the state cement plant must turn away out-of-state customers until all orders from South Dakotans are filled. This policy represents precisely the kind of economic protectionism that the Commerce Clause was intended to prevent.[1] The Court, however, finds no violation of the Commerce Clause, solely because the State produces the cement. I agree with the Court that the State of South Dakota may provide cement for its public needs without violating the Commerce Clause. But I cannot agree that South Dakota may withhold its cement from interstate commerce in order to benefit private citizens and businesses within the State.

I

The need to ensure unrestricted trade among the States created a major impetus for the drafting of the Constitution. "The power over commerce . . . was one of the primary objects for which the people of America adopted their government. . . ." *Gibbons* v. *Ogden,* 9 Wheat. 1, 190 (1824). Indeed, the Constitutional Convention was called after an earlier convention on trade and commercial problems proved inconclusive. C. Beard, An Economic Interpretation of the

---

[1] By "protectionism," I refer to state policies designed to protect private economic interests within the State from the forces of the interstate market. I would exclude from this term policies relating to traditional governmental functions, such as education, and subsidy programs like the one at issue in *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976). See *infra,* at 451–453.

Constitution 61–63 (1935); S. Bloom, History of the Formation of the Union Under the Constitution 14–15 (1940). In the subsequent debate over ratification, Alexander Hamilton emphasized the importance of unrestricted interstate commerce:

"An unrestrained intercourse between the States themselves will advance the trade of each, by an interchange of their respective productions. . . . Commercial enterprise will have much greater scope, from the diversity in the productions of different States. When the staple of one fails . . . it can call to its aid the staple of another." The Federalist, No. 11, p. 71 (J. Cooke ed., 1961) (A. Hamilton); see *id.*, No. 42, p. 283 (J. Madison).

The Commerce Clause has proved an effective weapon against protectionism. The Court has used it to strike down limitations on access to local goods, be they animal, *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979) (minnows); vegetable, *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970) (cantaloupes); or mineral, *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923) (natural gas). Only this Term, the Court held unconstitutional a Florida statute designed to exclude out-of-state investment advisers. *Lewis* v. *BT Investment Managers, Inc., ante*, p. 27. As we observed in *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 803 (1976), "this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods in response to the economic laws of supply and demand."

This case presents a novel constitutional question. The Commerce Clause would bar legislation imposing on private parties the type of restraint on commerce adopted by South Dakota. See *Pennsylvania* v. *West Virginia, supra;* cf. *Great A&P Tea Co.* v. *Cottrell*, 424 U. S. 366 (1976); *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1 (1928).[2] Conversely,

---

[2] The Court attempts to distinguish prior decisions that address the Commerce Clause limitations on a State's regulation of natural resource

a private business constitutionally could adopt a marketing policy that excluded customers who come from another State. This case falls between those polar situations. The State, through its Commission, engages in a commercial enterprise and restricts its own interstate distribution. The question is whether the Commission's policy should be treated like state regulation of private parties or like the marketing policy of a private business.

The application of the Commerce Clause to this case should turn on the nature of the governmental activity involved. If a public enterprise undertakes an "integral operatio[n] in areas of traditional governmental functions," *National League of Cities* v. *Usery,* 426 U. S. 833, 852 (1976), the Commerce Clause is not directly relevant. If, however, the State enters

---

exploitation. *E. g., Hughes* v. *Oklahoma,* 441 U. S. 322 (1979); *Pennsylvania* v. *West Virginia,* 262 U. S. 553 (1923). The Court contends that cement production, unlike the activities involved in those cases, "is the end product of a complex process whereby a costly physical plant and human labor act on raw materials." *Ante,* at 444. The Court's distinction fails in two respects. First, the principles articulated in the natural resources cases also have been applied in decisions involving agricultural production, notably milk processing. *E. g., H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525 (1949); *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970). More fundamentally, the Court's definition of cement production describes all sophisticated economic activity, including the exploitation of natural resources. The extraction of natural gas, for example, could hardly occur except through a "complex process whereby a costly physical plant and human labor act on raw materials."

The Court also suggests that the Commerce Clause has no application to this case because South Dakota does not "posses[s] unique access to the materials needed to produce cement." *Ante,* at 444. But in its regional market, South Dakota has unique access to *cement.* A cutoff in cement sales has the same economic impact as a refusal to sell resources like natural gas. Customers can seek other sources of supply, or find a substitute product, or do without. Regardless of the nature of the product the State hoards, the consumer has been denied the guarantee of the Commerce Clause that he "may look to . . . free competition from every producing area in the Nation to protect him from exploitation by any." *H. P. Hood & Sons* v. *Du Mond, supra,* at 539.

the private market and operates a commercial enterprise for the advantage of its private citizens, it may not evade the constitutional policy against economic Balkanization.

This distinction derives from the power of governments to supply their own needs, see *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 127 (1940); *Atkin* v. *Kansas,* 191 U. S. 207 (1903), and from the purpose of the Commerce Clause itself, which is designed to protect "the natural functioning of the interstate market," *Hughes* v. *Alexandria Scrap Corp., supra,* at 806. In procuring goods and services for the operation of government, a State may act without regard to the private marketplace and remove itself from the reach of the Commerce Clause. See *American Yearbook Co.* v. *Askew,* 339 F. Supp. 719 (MD Fla.), summarily aff'd, 409 U. S. 904 (1972). But when a State itself becomes a participant in the private market for other purposes, the Constitution forbids actions that would impede the flow of interstate commerce. These categories recognize no more than the "constitutional line between the State as government and the State as trader." *New York* v. *United States,* 326 U. S. 572, 579 (1946); see *United States* v. *California,* 297 U. S. 175 (1936); *Ohio* v. *Helvering,* 292 U. S. 360 (1934); *South Carolina* v. *United States,* 199 U. S. 437 (1905).

The Court holds that South Dakota, like a private business, should not be governed by the Commerce Clause when it enters the private market. But precisely because South Dakota is a State, it cannot be presumed to behave like an enterprise " 'engaged in an entirely private business.' " See *ante,* at 439, quoting *United States* v. *Colgate & Co.,* 250 U. S. 300, 307 (1919). A State frequently will respond to market conditions on the basis of political rather than economic concerns. To use the Court's terms, a State may attempt to act as a "market regulator" rather than a "market participant." See *ante,* at 436. In that situation, it is a pretense to equate the State with a private economic actor. State action burdening interstate trade is no less state action because it is

accomplished by a public agency authorized to participate in the private market.

## II

The threshold issue is whether South Dakota has undertaken integral government operations in an area of traditional governmental functions, or whether it has participated in the marketplace as a private firm. If the latter characterization applies, we also must determine whether the State Commission's marketing policy burdens the flow of interstate trade. This analysis highlights the differences between the state action here and that before the Court in *Hughes* v. *Alexandria Scrap Corp.*

## A

In *Alexandria Scrap,* a Virginia scrap processor challenged a Maryland program to pay bounties for every junk car registered in Maryland that was converted into scrap. The program imposed more onerous documentation standards on non-Maryland processors, thereby diverting Maryland "hulks" to in-state processors. The Virginia plaintiff argued that this diversion burdened interstate commerce.

As the Court today notes, *Alexandria Scrap* determined that Maryland's bounty program constituted direct state participation in the market for automobile hulks. *Ante,* at 435. But the critical question—the second step in the opinion's analysis—was whether the bounty program constituted an impermissible burden on interstate commerce. Recognizing that the case did not fit neatly into conventional Commerce Clause theory, 426 U. S., at 807, we found no burden on commerce.

The Court first observed:

"Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price. There has been an impact upon the interstate flow of hulks only because . . . Maryland effectively

has made it more lucrative for unlicensed suppliers to dispose of their hulks in Maryland. . . ." *Id.,* at 806.

We further stated "that the novelty of this case is not its presentation of a new form of 'burden' upon commerce, but that appellee should characterize Maryland's action as a burden which the Commerce Clause was intended to make suspect." *Id.,* at 807. The opinion then emphasized that "no trade barrier of the type forbidden by the Commerce Clause, and involved in previous cases, impedes th[e] movement [of hulks] out of State." *Id.,* at 809–810. Rather, the hulks "remain within Maryland in response to market forces, including that exerted by money from the State." *Id.,* at 810. The Court concluded that the subsidies provided under the Maryland program erected no barriers to trade. Consequently, the Commerce Clause did not forbid the Maryland program.

## B

Unlike the market subsidies at issue in *Alexandria Scrap,* the marketing policy of the South Dakota Cement Commission has cut off interstate trade.[3] The State can raise such a bar when it enters the market to supply its own needs. In order to ensure an adequate supply of cement for public uses, the State can withhold from interstate commerce the cement needed for public projects. Cf. *National League of Cities* v. *Usery, supra.*

The State, however, has no parallel justification for favoring private, in-state customers over out-of-state customers.[4]

---

[3] One distinction between a private and a governmental function is whether the activity is supported with general tax funds, as was the case for the reprocessing program in *Alexandria Scrap,* or whether it is financed by the revenues it generates. In this case, South Dakota's cement plant has supported itself for many years. See Tr. of Oral Arg. 27. There is thus no need to consider the question whether a state-subsidized business could confine its sales to local residents.

[4] The consequences of South Dakota's "residents-first" policy were devastating to petitioner Reeves, Inc., a Wyoming firm. For 20 years,

In response to political concerns that likely would be inconsequential to a private cement producer, South Dakota has shut off its cement sales to customers beyond its borders. That discrimination constitutes a direct barrier to trade "of the type forbidden by the Commerce Clause, and involved in previous cases. . . ." *Alexandria Scrap,* 426 U. S., at 810. The effect on interstate trade is the same as if the state legislature had imposed the policy on private cement producers. The Commerce Clause prohibits this severe restraint on commerce.

### III

I share the Court's desire to preserve state sovereignty. But the Commerce Clause long has been recognized as a limitation on that sovereignty, consciously designed to maintain a national market and defeat economic provincialism. The Court today approves protectionist state policies. In the absence of contrary congressional action,[5] those policies now can be implemented as long as the State itself directly participates in the market.[6]

By enforcing the Commerce Clause in this case, the Court would work no unfairness on the people of South Dakota. They still could reserve cement for public projects and share in whatever return the plant generated. They could not, how-

---

Reeves had purchased about 95% of its cement from the South Dakota plant. When the State imposed its preference for South Dakota residents in 1978, Reeves had to reduce its production by over 75%. *Ante,* at 432–433. As a result, its South Dakota competitors were in a vastly superior position to compete for work in the region.

[5] The Court explicitly does not exclude the possibility that, under the Commerce Clause, Congress might legislate against protectionist state policies. See *ante,* at 435–436.

[6] Since the Court's decision contains no limiting principles, a State will be able to manufacture any commercial product and withhold it from citizens of other States. This prerogative could extend, for example, to pharmaceutical goods, food products, or even synthetic or processed energy sources.

ever, use the power of the State to furnish themselves with cement forbidden to the people of neighboring States.

The creation of a free national economy was a major goal of the States when they resolved to unite under the Federal Constitution. The decision today cannot be reconciled with that purpose.