RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

THE MASON AND DIXON LINES
INCORPORATED; UNIVERSAL AM-CAN LTD.;
MASON DIXON INTERMODAL INC.,
　　　　　*Plaintiffs-Appellants* (11-1183),

E.L. HOLLINGSWORTH & CO., d.b.a. Chieftan
Contract Services; CHURCHILL
TRANSPORTATION INC.; SUPERIOR GLOBAL
INC.,
　　　　　*Intervenor-Plaintiffs-Appellants*
　　　　　　　　　(11-1186),

　　*v.*

KIRK T. STEUDLE; TED B. WAHBY,
　　　　　*Defendants-Appellees*,

DETROIT INTERNATIONAL BRIDGE CO.,
　　　　　*Defendant*.

Nos. 11-1183/1186

> Appeals from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 10-12285—David M. Lawson, District Judge.

Argued: January 11, 2012

Decided and Filed:  June 26, 2012

Before:  MERRITT and MOORE, Circuit Judges; and MAYS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Daniel C. Sullivan, SULLIVAN, HINCKS & CONWAY, Oak Brook, Illinois, Michael J. Leavitt, SULLIVAN & LEAVITT, Northville, Michigan, for Appellants.  LuAnn Cheyne Frost, OFFICE OF THE MICHIGAN ATTORNEY

_____
[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

GENERAL, Lansing, Michigan, for Appellees.  **ON BRIEF:** Daniel C. Sullivan, John Conway, SULLIVAN, HINCKS & CONWAY, Oak Brook, Illinois, John W. Bryant, DEAN & FULKERSON, P.C., Troy, Michigan, Michael J. Leavitt, Martin J. Leavitt, SULLIVAN & LEAVITT, Northville, Michigan, Kevin J. Plagens, KOPKA PINKUS DOLIN & EADS PLC, Farmington Hills, Michigan, Eric A. Parzianello, BEALS HUBBARD, PLC, Farmington Hills, Michigan, for Appellants.  LuAnn Cheyne Frost, Michael J. Dittnber, Robert L. Mol, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge.  The basic question before us is whether the State of Michigan acts in a proprietary capacity as a "market participant" rather than as a government regulator when it contracts with a private bridge company to divide up the work of building new ramps and roads that will connect various interstates with the Ambassador Bridge.  We hold that, for purposes of the Commerce Clause and the plaintiffs' statutory claims, the State is acting in a proprietary capacity here and, like the private bridge company, takes the role of a market participant when it joins with the bridge company in constructing ramps up to the bridge.

## I.  Facts

The three plaintiffs and the three intervening plaintiffs (collectively "the plaintiffs") are trucking companies that ship goods across the border between the United States and Canada.  They travel across a bridge between the two countries – the Ambassador Bridge, privately owned by the Detroit International Bridge Company.  The bridge crosses the Detroit River from Detroit, Michigan, to Windsor, Ontario, Canada.  Historical means of access to the bridge were inefficient and necessitated traversing the Detroit city streets.  The State, through its Department of Transportation, thus entered into a contract with the Bridge Company to construct new and improved approaches to the Bridge from interstate roads in Michigan.  The work is called the "Gateway Project." The contract specified that the State and the Bridge Company had separate construction jobs to perform, a fact that the district court discussed in its opinion and the parties do

not dispute. *See Mason & Dixon Lines, Inc., et al. v. Steudle, et al.*, 761 F. Supp. 2d 611, 617-18 (E.D. Mich. 2011). The State used State and federal highway funds to complete its share of the work, which included constructing several freeway ramps leading up to the Ambassador Bridge from the interstate roads.[1]

In February 2010, the State obtained a judicial order from the Michigan Circuit Court in Wayne County, Michigan, finding the Bridge Company to be in breach of the construction contract. *See Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.*, No. 09-015581-CK, Opinion and Order at 6 (Wayne Cnty. Cir. Ct., Feb. 1, 2010). The order mandated specific performance of the contract by the Bridge Company. *See id.* The Bridge Company thereafter filed a motion requesting that the state court order the State to open the freeway ramps. It asserted that this remedy was necessary in order for it to complete its part of the contract in compliance with the state court's previous order of specific performance. In August 2011, the state court denied the Bridge Company's request and instructed it to continue construction as previously ordered. *See Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.*, No. 09-015581-CK, Opinion and Order at 6 (Wayne Cnty. Cir. Ct., Aug. 11, 2011). However, the state court subsequently found the Bridge Company to be in defiance of the construction order. It held two of the Bridge Company's major officials in contempt and ordered them to be imprisoned until the Bridge Company complied with the prior court order. *See Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.*, No. 09-015581-CK, Opinion and Order at 6 (Wayne Cnty. Cir. Ct., January 12, 2012). In March 2012, in settlement of the contempt citation, the state court ordered the Bridge Company to relinquish its construction responsibilities to the State and establish a $16 million special fund to ensure completion of the Bridge Company's portion of the work. *See Mich. Dep't of Transp. v. Detroit Int'l Bridge Co.*, No. 09-015581-CK, Opinion and Order at 9 (Wayne Cnty. Cir. Ct., March 8, 2012).

---

[1]Congress passed the legislation authorizing funds for the Gateway Project in 1998 and described the project as "improvements to access roads and construction of access roads, approaches, and related facilities (such as signs, lights, and signals) necessary to connect the Ambassador Bridge in Detroit, Michigan, to the Interstate [Highway] System." Transportation Equity Act for the Twenty-First Century, Pub. L. No. 105–178, § 1217, 112 Stat. 107, 214 (1998).

The present federal litigation arose when the plaintiffs, some of which may share common ownership with the Bridge Company, filed suit in federal district court seeking an injunction requiring the defendants, officials of the Michigan Department of Transportation, to immediately open the freeway ramps leading up to the bridge. They claim that the State's refusal to open the newly-constructed-but-still-closed ramps represents an ongoing violation of federal statutory and constitutional law. The defendants responded by filing a motion to dismiss, asserting that the State would not open the freeway ramps because to do so prior to completing the Gateway Project construction would be unsafe, jeopardize federal funding, and interfere with the ongoing construction. On January 13, 2011, the district court granted the State's motion to dismiss the claims of all plaintiffs. *Mason & Dixon Lines, Inc.*, 761 F. Supp. 2d at 629.

The plaintiffs appeal the district court's order, raising federal statutory and constitutional claims as well as claims of procedural error. Our review of the lower court's dismissal order is *de novo*. *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011); *Babler v. Futhey*, 618 F.3d 514, 519 (6th Cir. 2010). However, the defendants point out that if this court were to reverse the decision of the district court and remand with instructions to grant the plaintiffs' Motion for a Preliminary Injunction, our decision might conflict with the state court's August 2011 ruling that nothing in the Gateway Project contract requires the State to open the ramps. Because we affirm the district court's dismissal of the plaintiffs' federal causes of action, we do not need to address the defendants' arguments for federal abstention in this case. We attach an Appendix with a labeled photograph and some background information about the layout around the Ambassador Bridge on the Detroit side of the border. This background information is given so that the reader can visualize the area and is not a part of our decision on the issues presented.

## II. Plaintiffs' Dormant Commerce Clause Claim

Beginning in 1976, the Supreme Court held that the "market participation" doctrine, announced in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), protects state and local laws from invalidity under the dormant Commerce Clause when the state

or municipality is acting in a proprietary capacity as a participant in the private market. In *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 339 (2008), the Supreme Court recently reaffirmed the continuing validity of the market participation doctrine. It explained:

> This "market participant" exception reflects a basic distinction . . . between States as market participants and States as market regulators," *Reeves*, *v. Stake*, 447 U.S. 429, 456 (1980), "[t]here [being] no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market," *id*., at 437. *See also White v. Massachusetts Council of Constr. Employees, Inc.*, 460 U.S. 204, 208 (1983) ("[W]hen a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"). Thus, in *Alexandria Scrap*, we found that a state law authorizing state payments to processors of automobile hulks validly burdened out-of-state processors with more onerous documentation requirements than their in-state counterparts. Likewise, *Reeves* accepted South Dakota's policy of giving in-state customers first dibs on cement produced by a state-owned plant, and *White* held that a Boston executive order requiring half the workers on city-financed construction projects to be city residents passed muster.

*See also* Lawrence Tribe, AMERICAN CONSTITUTIONAL LAW 430-34 (2d ed. 1988).

Here, the State is participating in the road construction market in order to improve transportation across a privately owned river crossing. It is not protecting local commerce by discriminating against out-of-state or foreign commercial interests, which is the typical reason for striking down state regulation under the dormant Commerce Clause. *See Davis*, 553 U.S. at 337-38, *Foreign Trade Council v. Natsios*, 181 F.3d 38, 67-68 (1st Cir. 1999). To the contrary, it is ensuring the completion of a contract, financed in part by State funds and federal funds that the State has the authority to administer, that will actually *encourage* the flow of commerce across state and international lines. As we discussed in the preceding section, the parties do not dispute that the State and the Bridge Company entered into a construction contract and each had separate work to perform. (*See* Letter Br. for Pls.-Appellants 14; Letter Br. for Intervenor Pls.-Appellants 18; Corrected Br. for Defs.-Appellees 6.) We therefore reject the

plaintiffs' argument that the State's refusal to open the freeway ramps prior to the completion of the Gateway Project violates the dormant Commerce Clause.

### III.  Claims Under § 14501(c) of the Motor Carriers Statute

Another question raised by this appeal is whether a subsection of the federal motor carriers statute, 49 U.S.C. § 14501(c) (2006), prohibits the State from keeping the ramps closed.  Section 14501(c) prevents a state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."[2]  The district court held that the State's refusal to open the ramps is not a state action within the meaning of this statutory provision. *Mason & Dixon Lines, Inc.*, 761 F. Supp. 2d at 620-21.  We agree.  As we said in our discussion of the dormant Commerce Clause, the State's role in this case is not that of a regulator but of a market participant that has contracted with the Bridge Company to provide a more efficient road system at the river crossing.

The Sixth Circuit has held that when a State simply participates in the free market it does not "regulate" and its actions "do not constitute regulation or have the

---

[2]49 U.S.C. §§ 14501(c)(1) and (2) read in their entirety as follows:

(c) Motor carriers of property —
    (1) General rule. — Except as provided in paragraphs (2) and (3) a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.
        (2) Matters not covered. — Paragraph (1) —
        (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorizations.
        (B) does not apply to the intrastate transportation of household goods; and
        (C) does not apply to the authority of a "State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

force and effect of law" within the meaning of § 14501(c). *Petrey v. City of Toledo*, 246 F.3d 548, 558-59 (6th Cir. 2001), *abrogated on other grounds by City of Columbus v. Ours Garage and Wrecker Serv., Inc.*, 536 U.S. 424 (2002). In *Petrey*, this court specifically held that the state or "municipal proprietor" exception expressly applies to § 14501(c)(1) in light of that provision's language and the intent of Congress, by enacting it, "to deregulate the motor carrier industry and encourage market forces." *Petrey*, 246 F.3d at 558 (internal quotation marks omitted). *See also Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686, 694-95 (5th Cir. 1999).

In this case, it is uncontested that the Gateway Project is a construction contract between an arm of the State of Michigan and a private company. *See Mason & Dixon Lines, Inc.*, 761 F. Supp. 2d at 617-18. As parties to that contract, the State and the Bridge Company function much like independent contractors who agreed to complete different portions of a large and complex project. *See id.* But according to the factual findings of the state court, which the state court determined were not in dispute and which we judicially notice, the Bridge Company has been remiss in fulfilling its end of the bargain and many portions of the project for which it is responsible remain unfinished. The State's refusal to open the ramps, therefore, is not the reflection of some law or regulatory impulse but of the State's proprietary interest in ensuring the performance of a contract. In *Reeves*, the Supreme Court reasoned that a State "may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal." 447 U.S. at 438 n. 10. *Petrey* and *Cardinal Towing* follow this same line of reasoning and explicitly apply it to claims brought under § 14501(c). *See Petrey*, 246 F.3d at 558-59; *Cardinal Towing*, 180 F.3d at 694-96. The motor carriers statute does not prohibit the challenged state action in this case.[3]

---

[3]The plaintiffs also bring a claim under another provision of the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10501, which governs rail transportation. Specifically, it confers on the Surface Transportation Board exclusive federal jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers . . . ." § 10501(1). Overlooking the fact that this provision applies to rail transportation and the plaintiffs in this case are motor carriers, the State's refusal to open the ramps is once again protected by the market participation doctrine. Much like § 14501(c), § 10501 is a deregulatory provision that is not implicated by the State's refusal to open the ramps, which is part of a contract dispute with a private bridge company. *See Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 804 (5th Cir. 2011).

### IV. Claims under 49 U.S.C. § 31114(a)(2)

The plaintiffs also argue that the State's unwillingness to open the ramps is foreclosed by a provision of the Surface Transportation Assistance Act, 49 U.S.C. § 31114(a)(2), which states that, absent safety considerations, "[a] State may not enact or enforce a law denying to a commercial motor vehicle . . . reasonable access between" the interstate highway system and "terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading . . . ." The district court disagreed and found that "[w]hether the [Ambassador] Bridge falls within the definition of a 'terminal' is debatable. However, even assuming that it does, [the prohibition described in § 31114(a)(2)] explicitly applies only to 'a law,' . . . [and m]oreover, the plaintiffs have not alleged that they do not have reasonable access to the [b]ridge." *Mason & Dixon Lines, Inc.*, 761 F. Supp. 2d at 625. The scope of § 31114(a)(2) is indeed narrower than that of § 14501(c)(1) because it only applies to actual laws and not also to "regulations and other provisions having the force and effect of law." Yet again, the State's conduct here is protected by the market participation doctrine that we have discussed at length in the preceding sections. Congress's paramount objective in passing the Surface Transportation Assistance Act was to "create uniform standards for commercial motor vehicles utilizing the Interstate and other federal highways" by removing burdensome state regulation restricting access to and from the highway system. *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1036 (7th Cir. 2008). Much like the motor carriers statute, the market participant exception has proper application to § 31114(a)(2) because it is consistent with that provision's deregulatory objective. Moreover, for the purposes of stating a claim under § 31114(a)(2), the plaintiffs in this case do not adequately explain why their current access to the bridge (via city streets) is unreasonable. As the district court reasoned, "the State does not violate the [Surface Transportation Assistance Act] if it provides an alternate route of access that is merely less preferable. *See Mason & Dixon Lines, Inc.*, 761 F. Supp. 2d at 625 (citing *Aux Sable Liquid Prods.*, 526 F.3d at 1036-37).

**V. Conclusion**

Based on the foregoing, we conclude that the district court properly granted the defendants' Motion to Dismiss as to the plaintiffs' federal statutory and constitutional claims. Because the underlying claims lack merit, we also affirm the district court's decision to deny the plaintiffs' Motion for Preliminary Injunction. *See Winter v. Natural Res. Def. Council, Inc*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits . . . ."). The plaintiffs' failure to survive the pleading stage also disposes of their remaining arguments on appeal. We affirm the dismissal of their § 14501(c)(1) claims and therefore need not address whether that provision is privately enforceable under 42 U.S.C. § 1983. The plaintiffs also assert that the district court improperly considered facts and evidence outside the pleadings and thereby converted the defendants' Motion to Dismiss into a Motion for Summary Judgment. *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Even if this were true, discovery could not cure the legal deficiencies of the claims in this case, which still fail as a matter of law.

Accordingly, the judgment of the district court is affirmed.

## APPENDIX

**Map of the Gateway Project**

Below is a map of the Gateway Project obtained from the State of Michigan's official website. To enhance clarity, we have highlighted the New Michigan Freeway Ramps and added additional labels. *See* Tia Klein and Chris Youngs, *Completion of Gateway Project: March 26, 2012 Pre-Bid Meeting*, MICHIGAN.GOV (last visited June 6, 2012, 9:49 AM), http://www.michigan.gov/documents/mdot/

Presentation_shown_at_the_Pre-Bid_Meeting_380399_7.pdf.



**Gateway Project Construction Layout**

The following description provides background information so that the reader can visualize the area around the bridge and the traffic flow.

The construction is located at the triangular convergence of I-75, Fort Street, and the Ambassador Bridge. At the center of the triangle is the U.S. Entry Plaza, which is

accessible to drivers through a toll booth station. The Entry Plaza houses a service area that includes duty free shops and a fueling station, which are run by the Bridge Company. The Entry Plaza is also the means of access to SO1, a ramp that carries trucks and cars from the left side of the Entry Plaza up onto the bridge. The problem with SO1 is the three piers below it, P11, P12, P13, which were improperly constructed by the Bridge Company. In the Gateway Project plans, the piers are meant to allow twin two-lane roads to pass under S01. The planned roads give drivers the option of bypassing the service area and proceeding directly from the toll booth station onto the Ambassador Bridge. However, the improperly constructed piers are hindering construction of these bypass roads, effectively forcing traffic into the service area. Their remediation was the responsibility of the Bridge Company but it has failed to complete the work. In February 2010, the Michigan Circuit Court in Wayne County, Michigan, issued an order mandating that the Bridge Company reconstruct the three piers. Because the Bridge Company has failed to comply with this specific performance order, the State will remediate the piers at the Bridge Company's expense.

The New Michigan Freeway Ramps (S29, highlighted in black and yellow on the map) are at the center of the dispute in the present litigation because the Department refuses to open them. The ramps are intended to bring drivers directly from I-75 (and in the case of the southernmost ramp, from Fort Street and West Grand Boulevard, as well) through the toll booths and into the Entry Plaza. From there, drivers will be able to proceed onto SO1 and the Ambassador Bridge. Currently, drivers can only reach the Bridge from I-75 via an indirect route that entails getting off at a separate interstate exit and using the Detroit city streets to access a small service road that leads to the toll booths at the Entry Plaza.

Running almost parallel to S01 are S02 and S32, which are two portions of the same ramp that connect a trucking road from the Inbound Truck Inspection to I-75. This will give trucks and other motor carriers coming from Canada more efficient access to the interstate. At the time the parties to this litigation submitted their briefs, the State claimed that it was waiting to receive an easement from the Bridge Company to

complete work on S32.  However, on March 8, 2012, the state court issued an order requiring the Bridge Company to grant all easements necessary for the State to complete the Gateway Project itself.  Apparently, the construction of both S02 and S32 is now complete.