United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 9, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-50454

HOUSTON COMMUNITY HOSPITAL,

Plaintiff-Appellee,

versus

BLUE CROSS AND BLUE SHIELD OF TEXAS, INC.,

Defendant-Appellant.

Appeal from the United States District Court
For the Western District of Texas, Austin

(USDC No. 1:04-CV-288)

Before GARWOOD, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Houston Community Hospital admitted and treated three federal employees covered by health benefits plans administered by Blue Cross and Blue Shield of Texas, Inc. under the Federal Employees Health Benefits Act. BCBST allegedly misrepresented the level of health care coverage of each patient and then refused to pay accordingly. In March 2004, Houston Community Hospital filed three separate state actions against BCBST for negligent misrepresentation and violations of the Texas Deceptive Trade

Practices Act and the Texas Insurance Act. BCBST removed the cases to federal court and moved for summary judgment claiming official immunity, federal sovereign immunity, and preemption. The district court denied the motion and BCBST appealed the now consolidated cases.

I

The Federal Employees Health Benefits Act[1] ("FEHBA") charges the United States Office of Personnel Management ("OPM") with negotiating contracts with private insurance carriers to provide health benefit plans to federal employees who may enroll in a Service Benefit Plan ("the Plan") pursuant to OPM regulations.[2] OPM issues all enrollees a Statement of Benefits ("the Brochure"). Blue Cross and Blue Shield Association, a private insurance carrier, entered into a contract, known as CS 1039, and which incorporated the Brochure, with OPM to provide the Plan to enrollees.[3] Appellant Blue Cross and Blue Shield of Texas ("BCBST") administers the Plan in Texas. As appellee Houston Community Hospital ("the Hospital") is not a party to the contract and has no contractual agreement with BCBST; it is not a

---

[1] 5 U.S.C. §§ 8901-14.

[2] The government and the enrollees are responsible for the premiums and Blue Cross draws its funds directly from the Federal Employees Health Benefits Fund. The Fund is not the property of Blue Cross and any surplus is placed in the Plan's contingency reserves, which may be used only at OPM's discretion. Blue Cross is paid from a negotiated service charge. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 126 S.Ct. 2121, 2126 (2006).

[3] *See* 5 U.S.C. § 8903.

participating provider. This means that under FEHBA, BCBST reimburses the Hospital up to a federal employee's coverage level, costs of medical care above that level to be paid by the employee.

According to the hospital, in 2003, three federal employees covered by a FEHBA health insurance plan issued by BCBST sought medical treatment at the Hospital. Before treating each patient, the Hospital contacted BCBST to verify the patients' coverage. On each occasion, BCBST allegedly represented to the Hospital that: (1) the patient's $300 deductible was met; (2) the patient was covered at either 70% or 100% up to an unlimited lifetime maximum amount; and (3) no preexisting conditions applied to the patient's admission. After the patients were admitted and treated, BCBST refused to pay the Hospital more than a fraction of the bill.[4] BCBST refused requests for payment and the Hospital filed three suits against BCBST in Texas state court for damages resulting from each misrepresentation made by BCBST. In addition to negligent misrepresentation, the Hospital alleged violations of the Texas Deceptive Trade Practices Act and the Texas Insurance Code.

In May 2004, BCBST removed all three cases to federal court. Although BCBST is a private insurance carrier, BCBST asserted that in performing the contract with OPM to provide health coverage to

---

[4] Patient Services Payment:

　　Paula V. Jackson: $8,688.12 of $89,021.00;
　　Elizabeth A. Jones: $8,688.12 of $50,487.96;
　　Carol Wilkerson: $8,688.14 of $56,775.38.

3

federal employees in Texas, it is an arm of the federal government vested with governmental immunity. BCBST moved for summary judgment based on: (1) official immunity; (2) sovereign immunity of the United States; and (3) preemption of the state torts by FEHBA.

The district court denied summary judgment, and BCBST timely filed a notice of appeal. Not seeking leave from the district court to file an interlocutory appeal under 28 U.S.C. § 1292(b), BCBST maintains that we have jurisdiction under the collateral order doctrine as well as pendent appellate jurisdiction.

## II

The collateral order doctrine is a "practical construction" of the final judgment rule of 28 U.S.C. § 1291.[5] This narrow doctrine permits a federal appellate court to review the "small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'"[6] That small category "includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action."[7]

---

[5] *Swint v. Chambers County Comm'n*, 514 U.S. 35, 41–42 (1995).

[6] *Id.*

[7] *Id.; Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (collateral order review for orders "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated").

Of course we have jurisdiction to determine our jurisdiction,[8] and we must, then, first determine whether BCBST's claims of either official or sovereign immunity are sources of jurisdiction. BCBST asks for even more. It urges that having asserted a substantial claim of immunity, it is entitled to invoke our pendent appellate jurisdiction over its preemption claim. Whatever the merits of this hook-and-ladder approach, it fails at the outset: we find no substantial claim of immunity, and we dismiss for lack of jurisdiction.

A. Official Immunity[9]

---

[8] *Cerveceria Cuauhtemoc Moctezuma S.A. de C.V. v. Mont. Bev. Co.*, 330 F.3d 284, 286 (5th Cir. 2003) (noting the "universally recognized truism that we have jurisdiction to determine our own jurisdiction").

[9] There is disagreement over whether BCBST's claim is for absolute official immunity or qualified immunity. The disagreement is semantic. *Westfall* can be read as providing either (1) absolute immunity, to the extent that the official could reasonably have believed her conduct was within the scope of her duty or (2) qualified immunity for conduct reasonably within the scope of a federal official's duties. *See* Seth P. Waxman & Trevor W. Morrison, *What Kind of Immunity?*, 112 YALE L.J. 2195, 2243 (2003). We must also distinguish the present immunity question, federal immunity from state tort, from our qualified- and absolute-immunity doctrine as it applies to state actors sued under section 1983 for violations of the federal law, as well as from our congruent doctrine that applies to federal officials sued for constitutional violations under *Bivins*. *See Butz v. Economou*, 438 U.S. 478, 495 (1978). Our *Westfall* doctrine pre-dates section 1983, *see Spalding v. Vilas*, 161 U.S. 483 (1896), and sounds in implied conflict preemption. *See* Waxman & Morrison, *supra*.

While a denial of official immunity is an appealable order,[10] the claim of immunity must be "substantial" to justify an appellate court's collateral order review.[11]

Federal officials long enjoyed immunity from suit based on state-law torts when their conduct was "within the scope of their official duties and . . . discretionary in nature."[12]  The application of this *Westfall* test to federal officials was superseded by Congress's passage in 1988 of the Federal Employees Liability Reform and Tort Compensation Act, also known as the Westfall Act, which eliminated the requirement that the acts be discretionary.[13]  The *Westfall* test, with the stricture of discretionary acts, remains the framework for determining when non-governmental persons or entities are entitled to the same

---

[10] *See Westfall v. Erwin*, 484 U.S. 292 (1988); *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 991 (5th Cir. 1999).

[11] There is confusion about whether a claim, in order to sustain an interlocutory appeal, need be "substantial" or merely "colorable."  Citing *Malina*, BCBST suggests that the standard is colorable.  *Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993).  This is an error.  The *Malina* court borrowed this incorrect standard from a case applying the officer removal statute, section 1442(a)(1), which requires the assertion of a colorable federal defense.  *Williams v. Brooks*, 945 F.2d 1322,1325 (5th Cir. 1991).  However, the Supreme Court and earlier panels of the Fifth Circuit have required a "substantial" claim of official immunity.  *Mitchell v. Forsyth*, 472 U.S. 511,525 (1985); *NF Indus., Inc. v. Export-Import Bank of the United States*, 846 F.2d 998, 1000 (5th Cir. 1988).

[12] *Westfall*, 484 U.S. at 297-98; *Evans v. Wright*, 582 F.2d 20, 21 (5th Cir. 1978).

[13] *See* 28 U.S.C. § 2679(d).

immunity.[14]    The Hospital contends that BCBST, as a private insurance carrier, has no substantial defense of official immunity.  We agree.

1

The Hospital first argues that BCBST was not here performing an official government function.[15]  The district court agreed, first acknowledging that "a number of courts have held private contractors may enjoy official immunity when performing official

---

[14]*See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2d Cir. 1998) (citing *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1446-50 (4th Cir. 1996); *Slotten v. Hoffman*, 999 F.2d 333, 336 (8th Cir. 1993)).

[15] The Hospital does not contest that BCBST acted within the scope of its discretionary duty as an insurance carrier.  In considering whether a claim is based on acts taken within a federal official's scope of authority, we have held that it is only necessary that the conduct be "within the outer perimeter of the line of duty." *Norton v. McShane*, 332 F.2d 855, 859 (5th Cir. 1964).  Here, the Hospital's focus is upon on two acts: first, the alleged relaying of guidance on coverage in a phone call and, second, paying the claims in a manner inconsistent with the oral guidance.  There are provisions in the Plan requiring that providers contact the carrier to precertify hospital stays (2003 Statement of Benefits at 12-13, 113), as well as terms in the Plan requiring carrier responsiveness to inquiries about the Plan (2002 CS 1039 § 1.9(b)).  Given these provisions, BCBST acts within the perimeter of its duties in responding to an inquiry about coverage; and, given that the carrier's main task is to determine and pay claims, a carrier's act of paying a claim (whether for the right or wrong amount) constitutes its duties.
With respect to discretion, BCBST argues that the carrier must assess the facts and apply the Plan provisions when answering questions about coverage; it must do the same when ultimately deciding the amount to pay.  As a result, BCBST contends that its acts are "more or less connect[ed] with the general matters committed by law" to BCBST's discretion. *Norton*, 332 F.2d at 859. Whether the conduct at issue in the instant case, simply relaying coverage information, constitutes discretionary action is not clear, but we will assume so for purposes of our analysis.  Thus, the present dispute does not present the question of whether BCBST acted beyond the scope of its authority in allegedly misrepresenting coverage information.

functions,"[16] but then explaining that no controlling authority provides blanket immunity for actions taken in the course of performing government contracts,[17] and finally rejecting BCBST's argument to extend immunity here, ruling that BCBST is not entitled to official immunity because "carriers do not perform 'official functions' in administering FEHBA benefits." The District court concluded that OPM's duties comprised "the approval of and contracting for benefits plans," not the actual administration of the Plan and that FEHBA carriers were not exercising any governmental function because "it is not apparent that they themselves perform any functions the OPM is itself charged with performing."

BCBST acknowledges that we have previously granted immunity to private entities and, in so doing, emphasized the entity's "quasi-governmental" capacity.[18] BCBST contends that FEHBA carriers exercise just such a "governmental function" for the purpose of official immunity. We are not persuaded.

---

[16] *See Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1446-48 (4th Cir. 1996) (deciding that immunity shields a government contractor from liability arising from statements it made in response to government investigators during an official investigation); *see also Slotten v. Hoffman*, 999 F.2d 333, 335-37 (8th Cir. 1993).

[17] *See Boyle v. United Techs Corp.*, 487 U.S. 500, 505 n.1 (1988) (declining to extend official immunity to all government contractors).

[18] *Austin Munic. Secs., Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 757 F.2d 676, 689 (5th Cir. 1985) (granting official immunity to administrative prosecutors and the nonprofit agency for which they work); *cf. NF Indus., Inc.*, 846 F.2d at 1000 (dismissing the interlocutory appeal from a denial of official immunity because private party had not sufficiently proved "that it was serving a governmental function").

Our extension of official immunity to contractors and other private parties is an application of the presumption that "immunity attaches to particular official functions, not to particular offices."[19] We recognize that "[i]f absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions," and that those functions are "no 'less important simply because they are exercised by officers of lower rank in the executive hierarchy.'"[20]

BCBST contends that the issue is not whether it performs functions that Congress delegated to OPM, but whether "the functions which the private parties performed pursuant to contract are functions which governmental employees would perform had the government not contracted them out."[21] In support, BCBST points to

---

[19] *Westfall*, 484 U.S. at 296 n.3.

[20] *Mangold*, 77 F.3d at 1447-48 (quoting *Barr v. Mateo*, 360 U.S. 564, 572-73 (1959)).

[21] *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 722 (10th Cir. 1988) (holding that a private corporation performing under a contract with a federal government agency may bring an interlocutory appeal from a denial of qualified immunity and that such a corporation is entitled to qualified immunity from an alleged constitutional deprivation compelled by contractual obligation), *distinguished in NF Indus., Inc.*, 846 F.2d at 1001 ("But in *Devargas*, the company was performing security services at an army installation-a function that is undeniably governmental and that, absent the private contract, would have been performed by a governmental agency."); *see also Boyle*, 487 U.S. at 512 ("To put it differently: It makes little sense to insulate the government against finiancial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the

FEHBA's legislative history, which shows that Congress's purpose was "to establish a health benefits program for Federal employees," so as to compete for the best talent with private companies.[22] To achieve that end, Congress sought to set up a partnership between OPM and private carriers. OPM is "responsible for the overall administration of the program while sharing the day-to-day operating responsibilities with the employing agencies and the insurance carriers."[23] In *Doe v. Devine*, then-Judge Ginsburg examined Congress's choice to use government contractors, rather than the government itself, to provide FEHBA health benefits and determined that Congress designed the program as it did in order to "ensure maximum health benefits for employees 'at the lowest possible cost to themselves and to the Government.'"[24] With a number of options offered by different carriers, rather than one plan administered solely by the government, Congress created a

---

production.").

[22] H.R. Rep. No. 86-957, at 2 (1959). Congress stated:

> Availability of this health protection program to Government employees will be of material assistance in improving the competitive position of the Government with respect to private enterprise in the recruitment and retention of competent civilian personnel so urgently needed to assist in maintaining and improving our strong national defense and in the operation of other essential Government programs.
> *Id.*

[23] *Id.*

[24] 703 F.2d 1319, 1330 n.41 (D.C. Cir. 1983)(quoting H.R. Rep. No. 86-957, at 4).

"system in which insurers compete vigorously for employees' subscription dollars."[25]  Thus, Congress intended for there to be a national health benefits program to serve the public interest of attracting the best possible workforce.  BCBST argues that carriers have an official role in the government program because Congress thought that delegating responsibility to carriers was the most efficient means to achieve the necessary ends.  Furthermore, BCBST notes that had it been more efficient to provide the benefits directly, Congress would have employed the federal workforce itself to do the task.  In short, BCBST argues that the District court's approach violated *Westfall*'s rule that official immunity attaches to functions, not particular offices.

But the district court ruled against BCBST because it disagreed that theirs was a government function.  As we see it, Congress did not with the FEHBA hand off a government function; rather Congress decided to get into the insurance business.  Not every activity in which government might decide to engage is a function of government in private hands.[26]  BCBST's argument would extend official immunity to all contractual delegations of authority by the government.  The district court correctly assessed the function assigned to OPM by Congress.

---

[25] *Id.* at n.43 (internal quotations omitted).

[26]*Cf. Reeves v. William Stake*, 447 U.S. 429 (1980).

11

Nor is this conclusion in tension with *Austin Municipal Securities*, in which we held that a private, nonprofit organization policing the securities field, including the stock exchanges, enjoyed immunity.[27] In that case, Congress delegated the authority to enforce securities laws directly to the non-governmental organizations, such as the NASD, pursuant to the Maloney Act.[28] Here Congress granted to the OPM, not the private carrier, authority to regulate. And while NASD performs a quasi-prosecutorial function in enforcing compliance with SEC regulation and related ethical standards,[29] BCBST cannot be viewed as a quasi-judicial entity in making underwriting decisions. Our case law frustrates the premise that insurance policy writing by a private insurer amounts to governmental policymaking.[30]

We also have denied official immunity to a consortium of private companies providing insurance to American exporters under an affiliation with a federal government agency.[31] BSBST urges that the same characteristics of the insurance relationship that were dispositive in that case lead to the opposite result here. Finding

---

[27]757 F.2d 676.

[28] *Id.* at 679-80 (citing 15 U.S.C. § 78o-3).

[29] *Id.* at 693.

[30] *NF Indus.*, 846 F.2d at 1001 (stating "FCIA has made no showing here that its duties require the exercise of governmental policymaking as distinguished from insurance policy-writing").

[31] 846 F.2d at 1002.

12

that the private companies had "made no showing . . . that its duties require the exercise of governmental policymaking," the Court in *NF Industries* stated:

> FCIA [*i.e.*, the insurers] is engaged primarily, if not exclusively, in the private business of insurance for profit. Its companies are paid by its customers, the insureds. The companies appear to act only as insurers, sharing in the profits and losses generated by the sale of their policies. They sell policies like those sold by other companies, not in privity with Eximbank, with whom they compete. And unlike most governmental agencies, which have mandated duties and a fixed "clientele," they are free (like any private company) to choose with whom they shall deal.[32]

BCBST argues that, in contrast to *NF Industries*, BCBST does not operate a "private business of insurance,"[33] but instead administers a federal program based on terms set by OPM, and profits solely through a service charge that OPM establishes. Rather than being "paid by its customers, the insureds,"[34] BCBST is paid from a Treasury account in which the government pools premium funds. Also, unlike the insurer in *NF Industries*, BCBST contends that it has "a fixed 'clientele'" and is not "free . . . to choose with whom they shall deal,"[35] for the Plan and OPM's regulations mandate

---

[32] *NF Indus.*, 846 F.2d at 1001-02.

[33] *Id.* at 1001.

[34] *Id.* at 1002.

[35] *Id.*

that BCBST provide benefits to all who meet eligibility requirements and enroll.[36]

But the fact that BCBST operates for profit, although not under the typical paradigm, only weakens its argument, further distinguishing it from the caselaw on which it relies. BCBST freely enters into the market, in which, by its own admission, carriers "compete vigorously" with other providers for customers within the pool of federal employees.[37]

BCBST's reliance upon the Medicare line of cases is also misplaced. As the district court noted, the governing statutes differ in a significant respect. The Center for Medicare and Medicaid Services ("CMS") delegates a portion of its statutory functions to private carriers under 42 C.F.R. § 421.5(b), which provides, for example, that "CMS is the real party of interest in any litigation involving the administration of the program."[38] No analogous delegation of authority exists here. Second, even assuming that BCBST and Medicare intermediaries are similarly situated — *i.e.* the Congressional grant of authority via the relevant administrative agency is analogous — BCBST fails to

---

[36] CS 1039 § 2.1(a)(2); 5 C.F.R. § 890.101.

[37] *See supra* note 25.

[38] 42 C.F.R. § 421.5(b)

14

persuade us that providing it with official immunity would do more good than harm, as we will explain.[39]

Finally, BCBST cites a recent unpublished decision, which purportedly confirms that FEHBA carriers should be treated the same for official immunity purposes as Medicare carriers.[40] The Eleventh Circuit relied on our Medicare immunity case law to hold that a FEHBA carrier is an agent of the government, so as to permit the carrier to remove its case under the officer-removal statute.[41] Finding itself bound by our earlier precedent on Medicare carriers, the Eleventh Circuit stated:

> A health plan insurer contracting with a government agency under a federal benefits program is considered a 'person acting under' a federal officer. *See Peterson*, 508 F.2d at 56-58 (finding § 1442(a)(1) jurisdiction over a claim by a physician against a health insurer operating under Medicare").[42]

BCBST, thus, contends that because the Eleventh Circuit has concluded, for the purpose of the officer removal statute, that they are "a person acting under a federal officer," then we should conclude, for the purpose of official immunity, that they perform a government function.

---

[39]*Westfall*, 484 U.S. at 299.

[40] *Anesthesiology Assocs. of Tallahassee, Fla., P.A. v. Blue Cross Blue Shield of Fla., Inc.*, 133 Fed. Appx. 738 (11th Cir. 2005) (unpublished).

[41] 28 U.S.C. § 1442(a)(1); *Id.* at 4.

[42] *Id.*

15

To the extent that our officer-removal doctrine is relevant to the instant question, we are still unpersuaded. Indeed, our *Peterson* case, on which the Eleventh Circuit relied, extended "federal officer" status to a BCBST employee who was sued for malicious prosecution, in discharging a function that, as we have explained, enjoys a long tradition of immunity.[43] The unpublished Eleventh-Circuit opinion falls well short of demanding that we extend official immunity to every FEHBA insurer contracting with the government.

### 2

Even if BCBST performs a governmental function for purposes of official immunity, the district court independently concluded that the "costs of granting official immunity to FEHBA carriers would outweigh the potential benefit." The district court's ruling followed the Supreme Court's holding in *Westfall* that "absolute immunity for federal officials is justified only when 'the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens.'"[44]

BCBST argues, contrary to the District court's holding, that a weighing of the costs and benefits of immunizing FEHBA carriers from similar suits favors official immunity. BCBST offers three

---

[43]*Peterson v. Weinberger*, 508 F.2d 45, 51-52 (5th Cir. 1975).

[44] *Westfall*, 484 U.S. at 295-96 (quoting *Doe v. McMillan*, 412 U.S. 306, 320 (1973)).

16

justifications of immunity.  First, it argues that immunity would preserve the incentive enrollees have to use preferred and participating providers that save the government money.  It explains that the availability of negligent misrepresentation actions would threaten to erase any requirement that the enrollee pay the difference between the Plan's payment and the non-participating provider's charge, since that difference would be obtained from the carrier in successful litigation.  We are not persuaded.  Any such hypothetical enrollee could seek remuneration only to the extent represented by BCBST, independent of the plan's payment scheme.  Indeed, here the hospital seeks only the remuneration that it says was explicitly promised.

Second, BCBST contends that official immunity would benefit enrollees.  Absent immunity, carriers may become "unduly timid in carrying out their official duty" and, as a result, might respond in only a limited way or not at all to provider inquiries about coverage.[45]  As a consequence, without sufficient information from the carrier to determine future payment terms, the provider might refuse to perform services or the provider might compel the enrollee to agree in advance to immediate payment.  Again, we are not persuaded.  Carriers such as BCBST compete for federal employees' subscription dollars.  This profit motive is sufficient to mitigate any timidity that might result from legal

---

[45] *Pani*, 152 F.3d at 74.

17

responsibility.[46]  Indeed, as the district court noted, "FEHBA carriers receive their contracts as a result of a competitive bidding process" and "competition between carriers is sufficient to protect th[e government's monetary] interest."

Third and most persuasively, BCBST argues that immunity would further FEHBA's goal of uniformity in plan administration, since it would negate the prospect of state law establishing the standards for carrier conduct, leaving that task solely to OPM.  As BCBST explains, "[P]roviders would not be permitted to pursue lucrative state law remedies for alleged negligent misrepresentations during coverage inquiries."  Providers still would have a remedy, however, potentially available to them: an appeal at OPM, followed by judicial review, based on an assignment from an enrollee. Moreover, any wrongful actions on the part of a carrier could also be corrected through OPM's police power, with OPM using its expertise to weigh the potential benefits and burdens to the program of penalizing a carrier and affording relief to the enrollee or provider.  This benefit is far from controlling, but we will credit it in our balancing.  BCBST has not persuaded us that uniformity would be *exceptionally* beneficial to the discharge of its purported governmental function.  And whatever unexceptional benefits attend uniformity are inherent in every use of official

---

[46] *See Austin Munic. Securities*, 757 F.2d at 693 (stating "[u]ntil this potential disincentive is proven to be more than a possibility, it is too tenuous to warrant the grant to these firms of absolute immunity").

18

immunity to displace state tort law through implied conflict preemption and are properly excluded from our balance. The Supreme Court could not have intended, by its directive to balance the costs and benefits of official immunity, for this court to rehash Professor Shapiro's *Federalism: A Dialogue*.

A final consideration, Congressional intent, also weighed heavily in the District court's denial of official immunity. The District court opined that, since Congress did not indemnify the carriers for torts, such as the one the Hospital alleges, it also must have intended to deny official immunity. This reasoning follows from, and situates our case in contrast to, the Medicare cases. The Medicare regulations indemnify intermediaries and interpose CMS as the real party of interest. BCBST argues that it would be reimbursed for a judgment in this case,[47] but that fact is unclear. In the absence of clear expression of Congressional intent, we decline to make the policy decision to extend official immunity to BCBST on these facts.

The Supreme Court has counseled that a court should not expand the scope of governmental immunity unless the interests involved

---

[47] BCBST argues that it may charge the government for all reasonable costs incurred while administering the plan, without exception for court judgments. Under the reimbursement rules applicable to the Service Benefit Plan, the carrier draws from the Treasury amounts to cover "cost[s] . . . [that are] actual, allowable, allocable, and reasonable." 48 C.F.R. § 1652.216-71(b); *see also* 2002 CS 1039 § 3.2(b). In particular, the governing regulations and the contract provisions permit the carrier to charge to the government "payments made and *liabilities incurred* for covered health care services" as well as "legal expenses incurred in the litigation of benefit payments." 48 C.F.R. § 1652.216-71(b)(2)(i)-(ii) (emphasis added); *see also* 2002 CS 1039 § 3.2(b)(2)(i)-(ii).

19

greatly outweigh the costs.[48]  Immunity comes at a "great cost" because an "injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by a federal official."[49]  The Hospital argues that this cost would clearly outweigh any potential benefits from extending official immunity to protect private insurance carriers like BCBST. That under the FEHBA preemption clause, BCBST is already protected from any claims by plan participants who have been denied health benefits under the plan cuts in favor of both parties.[50]  The only claims to be protected by an extension of immunity are the claims filed against BCBST resulting from its tortious conduct.  Not protecting BCBST from liability for tort claims will indirectly increase the costs of BCBST's services, and BCBST will shift these costs to its customers.  That is to say, BCBST has the usual market incentives to keep its negligence to a minimum and its costs low. These incentives animated the outsourcing at issue.

Finally, we note that the district court's ruling also reflects the public policy considerations that underpin the assertion of immunity.  BCBST is not entitled to assert official immunity because it does not establish a "firmly rooted" tradition of immunity for private insurance carriers who provide health

---

[48] *See Westfall*, 484 U.S. at 295-96.

[49] *Id.* at 295.

[50] *See* 5 C.F.R. 890.107(c).

benefit plans to federal employees.  There is no evidence that insurance companies were immune from suit at common law.

This is in contrast with the Medicare cases.  Courts have extended official immunity to carriers and intermediaries administering Medicare,[51] but those cases have involved the reporting of Medicare fraud, which implicates common law principles of immunity protecting witnesses in government-sponsored investigations and adjudications.[52]  In *Seiler*, for example, the question presented was whether a Medicare consultant could be accountable for libel in reporting potential Medicare fraud.[53]  And in *Pani*, the Second Circuit considered whether a nonprofit corporate insurance carrier investigating Medicare fraud could assert official immunity.  *Pani*'s holding, explicitly constrained to the case's unique facts,[54] depended on the nature of the conduct, the investigation of Medicare fraud, which more readily aligns with

---

[51] *See Pani*, 152 F.3d at 72-74 (citing *Peterson*, 508 F.2d at 58); *Midland Psych. Assocs., Inc. v. United States*, 145 F.3d 1000, 1003-05 (8th Cir. 1998); *Bushman v. Seiler*, 755 F.2d 653, 655-56 (8th Cir. 1985).

[52] *See Mangold*, 77 F.3d at 1448; *see also Group Health Inc. v. Blue Cross Ass'n.*, 625 F. Supp. 69, 78  (S.D.N.Y 1985) ("These cases demonstrate that a court must scrutinize the particular conduct at issue and weigh whether it is appropriate under the circumstances to protect the private party. In each case where a government contractor was involved such status was not significant in the outcome. Rather, the circumstances surrounding the particular conduct at issue were important to the determination that official immunity would apply.").

[53] 755 F.2d 653.

[54] "Because our review is limited to the allegations made in Pani's complaint pertaining to the reporting of fraud, we do not reach the issue of whether official immunity would apply to other conduct of a Medicare carrier or fiscal intermediary." *Id.* at 74.

21

the traditionally protected prosecutorial function of government. Unlike these Medicare defendants, BCBST's function is not prosecutorial or testimonial, both government functions that, in several different contexts, have been held to cover the social cost of immunity.

Likewise, the public policy underlying official immunity for federal officials is not implicated here. The Supreme Court identified two public policy justifications for the doctrine of official immunity: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; and (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and judgment required by the public good.[55] Neither of these public policy goals are furthered by extending official immunity to BCBST. Private parties are not required to enter into contracts with the federal government. They do so for a profit and, thus, are not required to use discretion in a way that might unfairly expose them to lawsuits. And, unlike the federal government, a private party is governed by self interest, not the public interest. BCBST does not face the dilemma of being required

---

[55] *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Davis v. Scherer*, 468 U.S. 183 (1984).

by law to use its verification-of-coverage discretion in a policymaking manner that might unfairly expose it to lawsuits.

Ultimately, BCBST does not make a substantial claim. Thus, the order denying BCBST the protections of official immunity cannot be reviewed under the collateral order doctrine.

B. Federal Sovereign Immunity

Again invoking the collateral order doctrine, BCBST attempts to rely on the denial of its assertion of federal sovereign immunity in order to create both a substantial claim of immunity[56] and jurisdiction in this Court. A threshold issue arises: whether the denial of sovereign immunity is amenable to interlocutory appeal.

BCBST argues that the circuits are divided over whether a denial of sovereign immunity is immediately appealable.[57] If true, such a split would provide good evidence of a substantial claim of immunity. The Hospital contends nevertheless that BCBST is not entitled to appeal the district court's adverse ruling on sovereign

_____

[56]The Hospital argues that FEHBA waives sovereign immunity and that the government is not the real party in interest. Four dissenting Justices have recently expressed the opinion that the federal government is the real party in interest under FEHBA. *See Empire Healthchoice Assurance, Inc.*, 126 S.Ct. at 2142 (BREYER, J., dissenting).

[57] *Compare MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658, 661 (5th Cir. 1996) (holding that the denial of a sovereign immunity defense under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), is a collateral order subject to interlocutory appeal) and *In re Sealed Case No. 99-3091*, 192 F.3d 995, 999 (D.C. Cir. 1999) (holding that where a district court rejects a federal agency's "claim of sovereign immunity," the "district court's ruling is immediately appealable as a collateral order") *with Alaska v. United States*, 64 F.3d 1352, 1356 (9th Cir. 1995) and *Pullman Constr. Indus. v. United States*, 23 F.3d 1166, 1168 (7th Cir. 1994).

23

immunity because the sovereign immunity of the United States is not "a right not to be sued" and may be effectively reviewed on appeal.[58]

It is, of course, axiomatic under principles of federal sovereign immunity "that the United States may not be sued without

---

[58]The Hospital also asserts that BCBST is not asserting a right not to be sued. This assertion is unavailing. The Hospital argues that BCBST does not assert an immunity from suit because BCBST asserts that the Hospital should have to pursue "an administrative appeal at OPM raising a grievance, *with judicial review against OPM* after the agency reaches a final decision." BCBST contends that the Hospital is required to follow its administrative claims process:

> Federal Employees Health Benefits (FEHB) carriers resolve FEHB claims under authority of Federal statute (5 U.S.C. chapter 89). A covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim. A legal action to review final action by OPM involving such denial of health benefits must be brought against OPM and not against the carrier or the carrier's subcontractors.

5 C.F.R. § 890.107(c). In addition, BCBST's Service Benefit Plan expressly provides for judicial review:

> If you do not agree with OPM's decision, your only recourse is to sue. If you decide to sue, you must file the suit against OPM in Federal court by December 31 of the third year after the year in which you received the disputed services, drugs, or supplies or from the year in which you were denied precertification or prior approval.

Thus, BCBST actually argues that the Hospital should be permitted judicial review in federal court—just not at this time. The Hospital argues that this is not an  immunity from suit and maintains that the plain language of the regulation only permits a "covered individual" to seek administrative and judicial review—not a third party such as the Hospital. The immunity asserted by BCBST, the Hospital contends, is akin to "a failure-to-exhaust-administrative-remedies defense," not an absolute right not to be sued at all. *See Lauro Lines*, 490 U.S. at 501.

This argument is problematic in that the statute authorizes suit against OPM, not BCBST; it expressly exempts the carrier from suit. Though the point is well taken that the Hospital would have a remedy if the contested issue were a standard coverage dispute and that no immunity exists for claims that fit properly within the statutory framework, the argument is not dispositive as to whether a suit against BCBST may proceed in an alternate forum; it clearly cannot. This last argument does not assist the Hospital in defeating BCBST's assertion of federal sovereign immunity.

its consent and that the existence of consent is a prerequisite for jurisdiction."[59]  Yet the Hospital contends that unlike a state's Eleventh Amendment immunity or a foreign sovereign's immunity from suit, the sovereign immunity of the United States is not a right not to be sued.[60]  In *Pullman Construction Industries, Inc. v. United States*,[61] the Seventh Circuit reviewed whether an order denying federal sovereign immunity constituted a collateral order subject to immediate review under *Cohen*.  In that case, a bankruptcy debtor brought an adversary proceeding against the United States to recover, as preferential transfers, approximately $500,000 in federal taxes paid to the United States during the 90-day period before bankruptcy.[62]  The United States moved to dismiss the claim based on its federal sovereign immunity.[63]  The district court denied the motion, and the United States filed an appeal.

On appeal, the Seventh Circuit considered the nature of the immunity of the United States to determine whether it was an

---

[59]*See United States v. Mitchell*, 463 U.S. 206, 212 (1983).

[60]*See Alaska*, 64 F.3d 1352; *Pullman Constr. Indus., Inc.*, 23 F.3d 1166; *see also CSX Transp., Inc. v. Kissimmee Util. Auth.*, 153 F.3d 1283, 1286 (11th Cir. 1998) ("Because Florida's state sovereign immunity is only immunity from liability, it is analogous to federal sovereign immunity. . . . To be immediately appealable, [the] denial of immunity must have been a denial of an immunity from suit."); *but see In re Sealed Case No. 99-3091*, 192 F.3d 995.

[61] 23 F.3d 1166.

[62] *Id.* at 1167.

[63] *Id.*

absolute right not to be sued, subject to immediate review under the collateral order doctrine.  The United States insisted that its right not be sued was well settled.  The court of appeals disagreed:

> If this is all so clear, one wonders why, in the entire existence of the United States, the federal government has never before taken an interlocutory appeal to assert sovereign immunity. Our case appears to be the first. Before today the United States has occasionally sought and received permission to take an interlocutory appeal on this question under 28 U.S.C. § 1292(b), a puzzling step if the federal government could appeal of right.[64]

The Seventh Circuit concluded that federal sovereign immunity from damages is all that remains:

> [T]he United States is no stranger to litigation in its own courts. Congress has consented to litigation in federal courts seeking equitable relief from the United States, . . . and U.S.C. § 106 gives consent in limited circumstances to litigation seeking money. Indeed, the United States Code is riddled with statutes authorizing relief against the United States and its agencies—the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80; the Tucker Act, 28 U.S.C. §§ 1346(a), 1491(c); the whole jurisdiction of the Court of Federal Claims, 28 U.S.C. §§ 1491-1509; dozens if not hundreds of sue-and-be-sued clauses; the list can be extended without much effort. Now that 5 U.S.C. § 702 exposes the United States to equitable relief, it is difficult to speak of federal sovereign immunity as a "right not to be sued." It is quite unlike the eleventh amendment . . . .  The only portion of the United States' original immunity from suit that Congress continues to assert is a right not to pay damages-a right circumscribed by statutes such as § 106.[65]

---

[64]23 F.3d at 1168.

[65]*Id.* at 1168.

The court concluded that federal sovereign immunity "today is nothing but a condensed way to refer to the fact that monetary relief is permissible only to the extent Congress has authorized it" and "does not imply that the United States retains a general 'right not to be sued' in its own courts for civil litigation in general or taxation in particular."[66] The court dismissed the interlocutory appeal for want of jurisdiction.[67]

In *Alaska v. United States*, the Ninth Circuit reached an even stronger conclusion.[68] In that case, the state of Alaska filed an action to quiet title to three river beds against the United States.[69] The United States moved to dismiss the action based on its sovereign immunity. On appeal, the court noted that "[a]t first glance, federal sovereign immunity seems to fit comfortably among the types of immunities for which immediate appeal is appropriate."[70] However, upon closer inspection, the court found otherwise:

> We hold that, despite the label "immunity," federal sovereign immunity is not best characterized as a "right not to stand trial altogether." . . . Like immunity from service of process (leading to lack of personal jurisdiction), federal sovereign immunity is better viewed as a right not to be subject to a binding

---

[66]*Id.*

[67]*Id.* at 1170.

[68]64 F.3d 1352 (9th Cir. 1995).

[69]*Id.* at 1353-54.

[70]*Id.* at 1355.

judgment. Such a right may be vindicated effectively after trial.[71]

The court then dismissed the United States's appeal for want of jurisdiction.

The Court of Appeals for the District of Columbia has reached the opposite conclusion, yet under circumstances too distinguishable to create a circuit split. When a district court ordered the Department of Justice to prosecute the Office of Independent Counsel ("OIC") for criminal contempt,[72] the *In re Sealed Case* court held that an order denying federal sovereign immunity may be reviewed under the collateral order doctrine.[73] There the OIC allegedly violated the federal grand jury secrecy rules by leaking information regarding a possible indictment of President Clinton for perjury and obstruction of justice in the Paula Jones case. In its ruling, the D.C. Circuit distinguished *Pullman Construction* and *Alaska*. First, the court noted that *Pullman Construction* and *Alaska* were civil cases (for which Congress has extensively waived federal sovereign immunity). As the court of appeals observed, "it is far from clear that Congress has waived federal sovereign immunity in the context of criminal

---

[71]*Id.*

[72]*See In re Sealed Case No. 99-3091*, 192 F.3d 995, 997 (D.C. Cir. 1999).

[73]*Id.*

contempt."[74] Second, after discussing the rationale that federal sovereign immunity can no longer be considered an absolute right not to be sued, the court openly doubted "that federal sovereign immunity is so limited, especially in the *unique circumstances presented here*."[75]

We are persuaded by *Pullman Construction* and find *In re Sealed Case* distinguishable for the very reasons identified by the D.C. Circuit. The federal government's extensive waiver of forum immunity, as detailed in *Pullman Construction*, simply does not extend to criminal proceedings against federal officers. Moreover, the special considerations at play in *In re Sealed Case* — a special prosecutor facing down the justice department — do not exist in the instant case. Indeed, Congress has waived sovereign immunity in the FEHBA context as to coverage disputes brought by federal employee patients.

Finally, BCBST draws our attention to this court's recent *en banc* decision in *In re Supreme Beef Processors*, where we interpreted a provision of the bankruptcy code purporting to waive federal immunity as a waiver of forum immunity only. BCBST argues that *Supreme Beef*'s recognition of federal immunity *from suit* forecloses our reliance on *Alaska*. We agree that our reasoning in

---

[74]*Id.* at 999-1000 ("We know of no statutory provision expressly waiving federal sovereign immunity from criminal contempt proceedings.").

[75]*Id.* at 1000 (emphasis added).

29

*Supreme Beef* is in tension with *Alaska*'s holding that Federal sovereign immunity is an immunity from damages only. However, *Supreme Beef* is consistent both with *Pullman Construction* and *In re Sealed Case.* Indeed, the Congressional waiver of forum immunity identified in *Supreme Beef* is but one of many provisions in the U.S. Code authorizing suit against the United States. And as the Seventh Circuit explained in *Pullman Construction*, these waivers, in aggregate, have overwhelmed the United States' forum immunity, such that "the only portion of the United States' original immunity from suit that Congress continues to assert is a right not to pay damages."[76] Hence, in accord with the Seventh Circuit, we hold that a denial of federal sovereign immunity is not subject to immediate review under the collateral order doctrine in the present context. We pass no judgment on the merits of BCBST's assertion of sovereign immunity.

C. Pendent Appellate Jurisdiction

Since neither assertion of immunity creates an independent basis for review — no substantial claim of official immunity and no presently justiciable claim of federal sovereign immunity — we need not entertain BCBST's invitation to exercise pendent appellate jurisdiction over any claim not otherwise amenable to interlocutory appeal.

DISMISSED.

---

[76]*Pullman Construction*, 23 F.3d at 1168.