PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-1216
_____


LEA AUGUSTIN; GERARD AUGUSTIN;
THOMAS MCSORLEY; DONNA MCSORLEY;
RICHMOND WATERFRONT INDUSTRIAL PARK, LLC


v.

CITY OF PHILADELPHIA,


Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-14-cv-4328)
District Judge: Honorable J. Curtis Joyner
_____


Argued November 8, 2017
Before: SMITH, *Chief Judge*, HARDIMAN, *Circuit Judge*,
and BRANN, *District Judge*.*

_____

* The Honorable Matthew W. Brann of the United States
District Court for the Middle District of Pennsylvania, sitting
by designation.

(Filed: July 18, 2018)

Craig R. Gottlieb [Argued]
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

John C. Connell
Archer & Greiner
One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ 08033

Jeffrey M. Scott
Archer & Greiner
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103

*Counsel for Appellant*

Irv Ackelsberg [Argued]
Edward Diver
John J. Grogan
Peter E. Leckman
Langer Grogan & Diver
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, PA 19103

Seth F. Kreimer
University of Pennsylvania School of Law
3400 Chestnut Street
Philadelphia, PA 19104

*Counsel for Appellees*

————————

OPINION OF THE COURT

————————

HARDIMAN, *Circuit Judge*.

This case involves a group of landlords who object to the system of liens used by the City of Philadelphia to collect unpaid gas bills. The District Court certified a class and held that the City had violated the landlords' rights under the Due Process Clause of the Fourteenth Amendment. The City filed this appeal, arguing that its procedures for collecting gas debts are constitutional. We agree with the City, so we will reverse the District Court's summary judgment in favor of the landlords.

I

Before evaluating the City's various arguments on appeal, we begin by describing Pennsylvania's municipal lien system. We then discuss how the City ensures it is paid for gas service and the effect its methods have on the Plaintiffs and the class of landlords they seek to represent. We conclude these

3

preliminaries with a review of the procedural history of the case.

A

Municipal liens in Pennsylvania are created and enforced in three steps as set out in the Pennsylvania Municipal Claim and Tax Lien Law (the Lien Law), 53 Pa. Stat. Ann. §§ 7101–7455. First, a lien is automatically created when a municipality acquires a claim against a property, since the Lien Law "declare[s]" that all such claims are "to be a lien on said property" with "priority to . . . the proceeds of any judicial sale." 53 Pa. Stat. Ann. § 7106(a)(1). Such liens arise by operation of law, *City of Philadelphia v. Manu*, 76 A.3d 601, 604 (Pa. Commw. Ct. 2013), and "without any form of hearing," when a municipal claim is "lawfully . . . assessed," *Shapiro v. Center Township*, 632 A.2d 994, 997 (Pa. Commw. Ct. 1993).

Second, the municipality perfects the lien by filing it with the appropriate local court, 53 Pa. Stat. Ann. § 7143, where it is publicly docketed by the Prothonotary, *id.* § 7106(b). Until filed, a municipal lien may not be enforced through a judicial sale of the property. *See id.* §§ 7185, 7282, 7283(a). The statute does not require municipalities to provide either notice or a hearing before filing a lien. *City of Philadelphia v. Perfetti*, 119 A.3d 396, 400 (Pa. Commw. Ct. 2015). Municipalities can delay filing a lien indefinitely, *id.*, but the lien is not enforceable against subsequent purchasers of the property until filed, 53 Pa. Stat. Ann. § 7432, and the failure to file a lien within 20 years after the claim accrues deprives the lien of priority over other encumbrances, *see id.* §§ 7183, 7432.

4

Third, the Lien Law establishes post-filing procedures for judicial sales. A municipality has two options if it wants to sell a property to satisfy a gas lien: (1) it can petition the court where the lien was filed for a rule requiring interested parties to show cause why the property should not be sold, *id.* § 7283(a), or (2) it may sue on the claim by a writ of *scire facias*, *id.* § 7185. *Scire facias* is meant to "warn the owner of the existence of a claim so that the owner may make any defenses known and show why the property should not be under judicial subjection of a municipal lien." *North Coventry Township v. Tripodi*, 64 A.3d 1128, 1133 (Pa. Commw. Ct. 2013). At the close of a *scire facias* proceeding, the municipality may obtain a judgment *in rem* and sell the property to satisfy it. *See* 53 Pa. Stat. Ann. §§ 7274, 7279, 7281.

Although a municipality may enforce a lien only after it is filed, the Lien Law empowers property owners to request a hearing on the legality of a lien at any time. There are two ways to get a hearing. First, a property owner may discharge the lien by paying the amount of the underlying claim into court and filing a petition setting out defenses. *Id.* § 7182. A jury then decides whether the municipality or the property owner is entitled to the deposited funds. *Id.*; *see also City of Philadelphia v. Merz*, 28 Pa. Super. 227, 228 (1905) (citation omitted). Second, after a claim is filed, a property owner may serve the municipality with a notice to issue a writ of *scire facias*. If the municipality does not commence *scire facias* proceedings within fifteen days after receiving the notice, its lien is voidable and the property owner may move to strike it. 53 Pa. Stat. Ann. § 7184.

5

B

The City distributes natural gas to its residents through Philadelphia Gas Works (PGW or, for the sake of variety, the utility), a public utility owned by the City. As a "city natural gas distribution operation," PGW is "entitled to . . . assess . . . and file as liens of record [municipal] claims for unpaid natural gas distribution service" under the Lien Law. 66 Pa. Cons. Stat. § 1414(a).

The cornerstone of PGW's lien operations is the "Lien Management System" (the System), which relies on computers to automatically file real-estate liens. The System scans PGW's billing database for accounts that, according to the utility's criteria, are "lien eligible." At least seven different criteria—termed "lien models"—may apply based on whether a property is commercial or residential, among other factors. A property will become lien eligible when it accumulates a large enough arrearage and has been delinquent for a long enough time, with "large enough" and "long enough" varying based on which model applies. For example, a typical residential account becomes lien eligible "once an arrearage reaches $300 and more than 91 days have elapsed since the last payment was made." *Augustin v. City of Philadelphia*, 2017 WL 56211, at *3 (E.D. Pa. Jan. 5, 2017).

In theory, once the System identifies an account as lien eligible, a pre-filing notification letter is sent to the property owner. Pre-filing notices do not contain much information. Pennsylvania's Public Utility Code prohibits PGW from disclosing certain confidential information, and the utility generally refuses to tell landlords either the identity of the tenant whose delinquency led to the lien or when the debt accrued. The notices in the record state only the amount of

6

money owed and a deadline for payment. Prior to November 2012, pre-filing notices afforded property owners 11 days to pay; today they afford 30 days. If that time passes without full payment, the System automatically files the lien with the Prothonotary, who dockets it. The System then sends a post-lien notice alerting the property owner that a lien has in fact been recorded.

In practice, however, the utility frequently interrupts the System's otherwise-automatic process by making certain manual adjustments. These adjustments are grouped into two categories—"blockers" and "exceptions." If the System encounters a blocker or an exception, it won't send notice and file a lien on its own. In those cases, notice and filing proceeds only if workers manually override the adjustment.

PGW's procedures for addressing accounts that are subject to a blocker or exception, but are otherwise lien eligible, do not prevent arrearages from continuing to grow. Nor do they prevent a delinquent customer from continuing to receive service. Rather, they operate only to prevent the lien securing the delinquency from being filed with the Prothonotary. "Debt often accumulates over many years" as delinquent customers continue to use gas. *Augustin*, 2017 WL 56211, at *5. And unless they "are specifically authorized . . . or are a third-party designee on the account," landlords are not apprised of those growing arrearages. *Id*.

Two blockers that play a significant role in this case are "name mismatches" and "address mismatches." If the name/address combination associated with a gas account does not match the City's property tax records, the System will not automatically file a lien on the delinquent account. These "mismatch liens" often arise when a tenant maintains her own

7

gas-service account. Nevertheless, at the time of the District Court's decision "less than 50% of the mismatch liens on record at PGW [were] attributable to a landlord-tenant situation." *Id.* at *9. Thousands of mismatch liens are filed every year, and "it is not uncommon for this blocker to delay the pre-lien notices from being sent for years, all while the account arrearages continue to grow." *Id* at *4.

Unsurprisingly, property owners regularly contact PGW to ask how they may challenge a lien. When that happens, the owner is often told to "file a complaint with the Pennsylvania Public Utility Commission ("PUC"), . . . [which] has repeatedly taken the position that it has no jurisdiction to act in matters which arise under the [Lien Law]." *Augustin v. City of Philadelphia*, 171 F. Supp. 3d 404, 414 (E.D. Pa. 2016). The record shows that the utility knew this and took advantage of it by continuing to steer customers in the PUC's direction in spite of the fact that the PUC declined jurisdiction over such complaints. Indeed, when two of the named Plaintiffs here filed complaints with the PUC, PGW immediately turned around and successfully challenged the agency's jurisdiction.

C

The landlords complain that the City's lien procedures violate their due process rights. There are five named plaintiffs—two pairs of residential landlords and one commercial landlord. Lea and Gerard Augustin own several residential properties in Philadelphia. Between 2009 and 2012, PGW repeatedly filed thousands of dollars' worth of liens against the Augustins' properties on account of tenant arrearages dating back as far as 2004. The Augustins first learned of the liens in 2011, when the utility sent pre-filing notices to their home address. Previous notices had not reached

8

the Augustins because PGW had mailed them to their rental properties instead of their residence. In 2012, Lea Augustin contacted the utility to seek guidance about the liens and was told to file a complaint with the PUC. When the Augustins did so, PGW objected to their complaint on the ground that the PUC had no power to determine the validity of gas liens. The PUC agreed, and dismissed the Augustins' complaint for lack of jurisdiction in May 2013.

Donna and Thomas McSorley are also residential landlords. In 2013, PGW filed a lien against one of their rental properties for about $1,150. Like the Augustins, the McSorleys first learned of their tenants' failure to pay their gas bills when they received a pre-filing notice. The McSorleys paid off their lien in September 2014.

The final named Plaintiff, Richmond Waterfront Industrial Park LLC, owns 10 commercial and industrial properties in Philadelphia. In 2012, PGW filed two liens against one of Richmond's properties, one for about $3,500, and one for more than $27,000. Richmond eventually persuaded the utility to identify the delinquent accounts. The larger lien secured a delinquency attributable to a tenant that had vacated Richmond's property in 2003. The smaller one was attributable to a tenant that had vacated in 2010. Armed with that information, Richmond convinced PGW not to file the larger lien, but the utility did eventually file the smaller one. As in the Augustins' case, Richmond was told to challenge the lien before the PUC. Once again, the PUC declined to act on the ground that it lacked jurisdiction over Lien Law disputes.

D

The five named plaintiffs commenced this action in the District Court in mid-July 2014. After discovery closed, the parties filed cross-motions for summary judgment, with the landlords' motion limited to the question of whether the utility's procedures for filing gas liens failed to provide due process. The District Court granted summary judgment for the landlords, denied the City's cross-motion, and entered a preliminary injunction barring the City from filing new liens or collecting on old ones against members of the putative class.

With liability decided, the landlords moved for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure and for the entry of final injunctive relief. After a two-day hearing, the District Court granted both motions.

First, the Court certified a class of

[a]ll owners of rental properties within the City of Philadelphia whose property is or will be encumbered by a municipal lien to enforce unpaid charges for natural gas service, where such service, according to the records of the Philadelphia Gas Works, was provided to a residential or commercial gas service customer other than the property owner, excluding however, any owner who was a party in a state court *scire facias* proceeding regarding such lien initiated under Article 3 of the Pennsylvania Municipal Claims and Tax Lien Act, 53 P.S. § 7182, *et seq.* if a final judgment in such proceeding was entered.

10

App. 57. The named Plaintiffs were appointed class representatives, and their lawyers were named class counsel.

Second, the District Court entered a final remedial order that included both prospective and retroactive elements. The District Court enjoined the City and PGW from "filing any liens on real property to enforce unpaid charges for natural gas service, where such service . . . was provided to a . . . customer other than the owner of the property targeted for the lien using its current methods and procedures for doing so." App. 96. The order further allowed the City to resume filing liens if it

> provide[d] property owners with (a) meaningful notice of the facts underlying the decision to impose a lien which is (b) delivered at a sufficiently early time as to enable the property owner to resolve the problem before the account delinquency grows unnecessarily, and (c) provide[d] the property owner with an administrative opportunity to obtain all relevant facts and have all factual disputes resolved before the lien is imposed.

App. 96–97.

In addition to the injunction, the District Court ordered that "[a]ny existing gas liens currently of record which were imposed on properties for unpaid gas charges incurred by a class member," or "Covered Liens," were "invalid, null, and void." App. 97. It directed the City to vacate all Covered Liens and enjoined future attempts to collect them. And it told the City to refund all the money it had accepted in satisfaction of Covered Liens since the entry of the preliminary injunction. The City filed this appeal.

11

II[1]

A

Before analyzing whether the lien procedures at issue here satisfy due process, we must first address the City's claim that it need not provide any process at all.

The Due Process Clause applies so long as the City acts to deprive the landlords of a "significant"—and therefore constitutionally protected—property interest. *See Fuentes v. Shevin*, 407 U.S. 67, 86 (1972). The point at which an encumbrance on real estate requires due process is controlled by the Supreme Court's decision in *Connecticut v. Doehr*, 501 U.S. 1 (1991). In that case, the Court considered the constitutionality of Connecticut's prejudgment attachment scheme and held that attachment represents a significant deprivation of property, even when the defendant remains in possession of the attached assets. The Court reasoned that attachment "clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." *Id.* at 11.

Under the Lien Law, similar consequences follow the *filing*—but not the automatic creation—of a lien securing a municipal claim. Municipal liens are entitled to priority over everything but taxes. 53 Pa. Stat. Ann. § 7106(a)(1). Once recorded with the Prothonotary, a gas lien represents a significant cloud on the property owner's title. Indeed, the

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

12

District Court found that the utility depends on that leverage to collect on its liens. *Augustin*, 2017 WL 56211, at \*9. Rather than forcing a sheriff's sale of liened property, the utility's ordinary practice is to "wait[] for properties to either be sold or refinanced such that the owner needs to clear title to their real estate." *Id*. A filed lien, then, interferes sufficiently with property interests to trigger scrutiny under the Due Process Clause.

The same is not true, however, of an unfiled lien, which exists only by virtue of its automatic creation under the Lien Law. Until perfected by filing, liens are not a matter of public record and, by the statute's express language, will not cloud the title held by subsequent purchasers. *See* 53 Pa. Stat. Ann. § 7432. A lien such as this that does not actually interfere with property in any practical sense is not a "significant" deprivation for due process purposes. The ultimate question in this case, then, is what process must accompany the *filing* of a gas lien.

The City resists that conclusion, relying largely on pre-*Doehr* federal decisions as authority for the proposition that, so long as the owner retains possession and control over her property, liens do not work a deprivation sufficient to trigger an entitlement to due process. In this Circuit, it was indeed the law before *Doehr* that "[u]nder the [Lien Law] the filing of the [lien] does not affect the alleged debtor's use of the property, and no interference with that use can take place until the municipality resorts to a judicial foreclosure." *Winpenny v. Krotow*, 574 F.2d 176, 177 (3d Cir. 1978). That rule, however, which has not been relied on by this Court since it was first

13

announced more than 30 years ago, must now give way to the Supreme Court's contrary holding in *Doehr*.[2]

B

Having rejected the City's threshold argument, we turn to the landlords' procedural due process claims, which are subject to the familiar standard first announced in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Whether the City's lien procedures comport with due process depends on the balance of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards" in avoiding such errors; and (3) the governmental interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." *Id.* at 335. Because this dispute involves an essentially private debt stemming from the City's participation in ordinary commerce, rather than any truly governmental action, the final prong of the *Mathews* test is refocused on "the interest of the party seeking the prejudgment remedy," with "due regard for any ancillary interest the government may have

---

[2] The City also cites a recent decision of the Pennsylvania Commonwealth Court upholding the Lien Law against a similar challenge, which relies in part on substantially the same obsolete reasoning as *Winpenny*. *See* City Br. 30 (citing *City of Philadelphia v. Perfetti*, 119 A.3d 396, 405 (Pa. Commw. Ct. 2015).

in providing the procedure or forgoing the added burden of providing greater protections." *Doehr*, 501 U.S. at 11.[3]

There is little need for further discussion of the landlords' interest. Although the filing of a lien is "significant" enough to trigger the protections of the Due Process Clause, it remains a relatively limited interference with the landlords' property. An owner whose property is subject to a lien filed under the Lien Law may still use the property or sell it subject to the gas debts. Thus, the filing of a lien under the statute burdens the right to alienate the subject property, but does not abolish it. Indeed, the District Court found that "none of the plaintiffs have suffered any injury to their personal credit or been impeded or hampered in securing personal loans or re-financing their personal residences." *Augustin*, 2017 WL

---

[3] When States act in commerce as ordinary buyers or sellers, the Supreme Court has long recognized at least one context in which they are treated like any other market participant, with neither particular solicitude granted nor special constraints imposed by virtue of their status as sovereigns. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 436–40 (1980) (discussing the market-participant exception to the dormant Commerce Clause). That treatment "reflects a 'basic distinction between States as market participants and States as market regulators'" we recognize here as well. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (quoting *Reeves*, 447 U.S. at 436). *But see Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 582 n.12 (3d Cir. 2017) (declining to decide whether to recognize a similar market-participant exception to state-action immunity under the Sherman Act, and observing that the existence of such an exception is an open question).

56211, at *9. Nor have the liens interfered with the landlords' "ability to maintain their properties or collect rents." *Id.* This is essentially identical to the deprivation that the Supreme Court addressed in *Doehr*. As such, that case provides a useful benchmark for comparison respecting the other factors that play into our inquiry under *Mathews*.

The next factor, the risk of an erroneous deprivation, is somewhat difficult to assess on the present record, which comes to us following a summary judgment. As such, the District Court was obliged to determine that there was no genuine dispute as to the facts on which it based its decision. *See* Fed. R. Civ. P. 56(a). But the Court largely failed to do so with respect to the risk of erroneously-filed liens.

The District Court did devote a portion of its order to discussing the "Landlord Cooperation Program" (LCP)—a voluntary accommodation that the utility reached with a group of landlords, under which it refrains from filing liens on properties owned by landlords who agree to meet certain conditions. Describing problems that PGW had in implementing that program, the District Court found as fact that "there are frequent errors in the amounts of the liens placed [on LCP participants' properties], which requires [sic] the original lien to be manually removed and then replaced by a lien for a valid amount." *Augustin*, 171 F. Supp. 3d at 413. This factual finding was clearly erroneous, however, because the witness whose testimony the District Court relied on said no such thing. Rather, as the City points out, in response to the question, "[D]o you ever have to deal with [errors in lien amounts]?", the testifying PGW employee stated only that "[t]here ha[d] been a few, yes," App. 718 (Tr. 132:20–22).

16

On appeal, the landlords fare little better in demonstrating a major risk of erroneous liens. They assert that, "where PGW's computer system is filing liens with little human involvement, there is a substantial risk of liens being filed erroneously or in incorrect amounts," and claim that they "presented the district court with a substantial evidentiary record concerning the likelihood of mistaken decisions and erroneous deprivations." Landlords Br. 41. Their opening brief to this Court, however, points to only one place in the record where we can find such evidence—two citations in one footnote to the report of the landlords' expert. And even reading that evidence in the most generous light, the risk of erroneous deprivation in this case remains significantly less than that which existed in *Doehr*.

In that case, Connecticut permitted *ex parte* attachment, before judgment, to secure payment of a potential future personal-injury judgment. *Doehr*, 501 U.S. at 5–6. The petitioner attached Doehr's home "in conjunction with a civil action for assault and battery that he was seeking to institute against Doehr." *Id.* at 5. As the Second Circuit has explained, "[i]n *Doehr*, a substantial risk of error was created by the nature of the underlying claim: an intentional tort that had no connection to the property and did not 'readily lend itself to accurate *ex parte* assessment of the merits.'" *Diaz v. Paterson*, 547 F.3d 88, 98 (2d Cir. 2008) (quoting *Doehr*, 501 U.S. at 17) (internal alterations omitted).

By contrast, disputes about the applicability of a municipal lien involve only "determining the existence of a debt or delinquent payments"—a matter that lends itself to documentary proof and can be calculated with relatively little risk of error. *Doehr*, 501 U.S. at 14–15. The landlords' expert points out that the rules governing gas billing are complicated

17

and sometimes subject to reasonable dispute. And to be sure, the calculation of a gas bill is not without risk of error. *Cf. Diaz*, 547 F.3d at 98 (prejudgment remedies sought for a promissory note for a sum certain and for a mortgage). But although it may not always be simple to calculate what is due PGW, the fact remains that a claim for gas service already provided is "pre-existing, readily quantifiable, and largely susceptible to proof by documentary evidence." *Id*.

The risk-of-erroneous-deprivation factor, in addition to considering the probability of error, also takes into account the consequences of error. More protective process will generally be required the more the "length or severity of the deprivation" indicate "a likelihood" that "serious loss" will accompany any mistake. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19 (1978). Whether a loss is minimal enough to excuse the ordinary requirement of pre-deprivation process will depend on a variety of factors, including the hardship suffered during the deprivation and the adequacy of the available post-deprivation remedies.

By way of example, in *Dixon v. Love*, 431 U.S. 105 (1977), the Supreme Court considered the risk of error associated with the decision to suspend a truck driver's license. *Id.* at 106, 111. In concluding that the risk was relatively low, the Court noted that retroactive relief would never be able to make a wrongly-suspended driver fully whole because the driver would have been irreversibly deprived of time on the road. *Id.* at 113. On the other hand, the Court observed that "a driver's license may not be so vital and essential as are social insurance payments on which the recipient may depend for his very subsistence." *Id.* (citing *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970)). In this appeal, both factors point toward a relatively low risk. Under most circumstances, an erroneously

filed lien can be fully remedied by a post-filing hearing and an order removing the encumbrance. And as we noted already, the consequences of a mistaken lien are relatively slight—even a filed lien does not interfere with the owner's present use and enjoyment of her property.

Moreover, the risks that *are* associated with an erroneous lien are mitigated by the post-deprivation remedies available under the Lien Law. *See Doehr*, 501 U.S. at 14–15. The most significant risk is that a cloud on title will hinder the owner's ability to dispose of her property exactly as she wishes. She may be unable to borrow against it, unable to sell it, or be otherwise hindered in various transactions.

But as the City points out, an owner who wishes to do any of those things despite a lien has two prompt remedies. First, she may serve on the City a notice to issue a writ of *scire facias*, in which case the City has only 15 days to respond or the lien becomes voidable. Second, an owner may pay security into court—immediately clearing the lien—and then proceed, clean title in hand, to a full hearing on the validity of the lien. Indeed, a property owner could do this before a lien is ever filed. *See* 53 Pa. Stat. Ann. § 7182. And because the utility provides 30 days' notice before a lien is filed, owners have a meaningful opportunity to avoid the recording of a lien altogether—without prejudicing any defenses they might have.

In addition to these statutory remedies, landlords may structure their tenant relationships to eliminate the possibility of a surprise encumbrance. As the City points out, landlords are well-positioned to apprise themselves of their tenants' obligations to PGW, without demanding that the City do so for them. They may "(1) contractually require the tenant to prove utility payment; (2) contractually require the tenant to allow

[the] landlord access to the tenant's account information; or (3) place the bill in the [landlord's] name by keeping himself as customer of record, and incorporate the cost into the rental rates." City Br. 23. Where an individual can protect himself at little or no expense, the case for the government's obligation to protect him through a potentially costly and inevitably imperfect notice regime is markedly less compelling.

The final two factors in our due process inquiry under *Mathews* and *Doehr* are the interests of PGW as the party seeking a prejudgment lien, and of the City as the governmental entity responsible for providing any additional procedural protections. The utility's interest is straightforward—it has a strong interest in collecting on debts legitimately imposed for service already provided. That interest in particular, intermingled as it is with the City's interest in stable municipal finances, and the public's interest in a functioning gas-distribution network, weighs heavily in our analysis.

Moreover, because PGW enjoys an automatic lien on a property to which it provides service, it has a preexisting interest in the delinquent property at the time a lien is filed. In *Doehr*, the Supreme Court rejected Connecticut's prejudgment attachment scheme in part because it ran in favor of claimants who lacked any preexisting interest in the property being attached. 501 U.S. at 16. As the Court explained, while the presence of such an interest does not mean that *no* process is due, "a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures that are otherwise suspect." *Id.* at 12 n.4. Chief Justice Rehnquist's concurrence in *Doehr* sheds additional light on what those circumstances might entail:

> [I]n *Spielman-Fond*[*, Inc. v. Hanson's, Inc.*, 417 U.S. 901 (1974)] . . . Arizona recognized a pre-existing lien in favor of unpaid mechanics and materialmen . . . . Since neither the labor nor the material can be reclaimed once it has become a part of the realty, this is the only method by which workmen . . . may be given a remedy against a property owner who has defaulted on his promise to pay for the labor and the materials. To require any sort of a contested court hearing or bond before the notice of lien takes effect would largely defeat the purpose of these statutes.

501 U.S. at 28 (Rehnquist, C.J., concurring).

Essentially the same considerations apply here—the company can't take back its gas, so it gets an automatic senior lien to secure its deliveries. And since PGW is a regulated utility, its ability to select its customers based on creditworthiness is greatly restricted. Under these circumstances, the recourse that a lien provides to the value of the property itself is, as in *Spielman-Fond*, "the only method" for giving PGW a reliable remedy for non-payment. *See id.*

The landlords respond that this case is different than other preexisting interest cases "because the debt the City is seeking to recover is the debt of someone *other* than the property owner. Pre-deprivation notice is less necessary when the person affected already knows of the impending deprivation, as is more often the case in a mechanic's lien or *lis pendens* situation." Landlords' Br. 38. We disagree. As the City points out, nothing in *Doehr* or *Spielman-Fond* suggests that the presence or absence of a preexisting interest goes to

21

whether the debtor has prior notice of the debt. Rather, those cases rely on preexisting interests only to assess the strength of the claimant's interest in the prejudgment remedy he seeks.

Based on the foregoing analysis, we will reverse the District Court's partial summary judgment for the landlords. The District Court's *Mathews* balancing went astray in three ways. First, it failed to recognize the relatively mild imposition that filing a municipal lien works on landlords' property rights. Second, it overstated the record as to the risk of erroneously-filed liens and failed to account for the relative ease of accurately calculating gas debts. And finally, it did not take proper account of PGW's preexisting interest in liened property. We hold that PGW's procedures, in combination with the remedies made available under the Lien Law, are adequate to satisfy due process as applied to the landlords.[4]

---

[4] Our conclusion accords with those of the Second and Tenth Circuits as well as the Rhode Island Supreme Court, which have, since *Doehr*, upheld similar schemes that involved encumbering real property to secure a creditors' preexisting interests. *See Diaz v. Paterson*, 547 F.3d 88, 90 (2d Cir. 2008) (upholding state *lis pendens* scheme); *Shaumyan v. O'Neill*, 987 F.2d 122, 122–23 (2d Cir. 1993) (upholding the same prejudgment attachment statute addressed in *Doehr*, but as applied to a suit between a property owner and contractor); *Cobb v. Saturn Land Co., Inc.*, 966 F.2d 1334, 1337–38 (10th Cir. 1992) (upholding state mechanic's lien statute); *Gem Plumbing & Heating Co., Inc. v. Rossi*, 867 A.2d 796, 818 (R.I. 2005) (upholding state mechanic's lien scheme).

\*     \*     \*

For the foregoing reasons, we will reverse the Court's summary judgment that PGW's lien procedures violate due process, and remand with instructions to enter judgment for the City.[5]

---

[5] The City also asks us to reverse the District Court's class certification order for lack of an adequate class representative. We decline to do so because the City failed to preserve its argument that Richmond is an inadequate representative. Consequently, our decision binds the absent class members as well as the named parties.